AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

**F I L E D**
CLERK, U.S. DISTRICT COURT

4/20/2026

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ts _____ DEPUTY

for the
Central District of California

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> SHAMIM MAFI, <br><br> Defendant. | Case No. 2:26-mj-02332-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between on or about August 2024 and the present, in the County of Los Angeles in the Central District of California and elsewhere, defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 50 U.S.C. § 1705(a), (c) | Conspiracy to Violate the International Emergency Economic Powers Act |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Special Agent ██████████, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:          April 18, 2026

*Judge's signature*

City and state:   Los Angeles, California

The Hon. A. Joel Richlin, U.S.M.J.
*Printed name and title*

AUSA:   Kedar S. Bhatia (x4442), David C. Lachman (x5564)

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................... 2

II.     BACKGROUND OF THE AFFIANT ................................. 3

III.    SUMMARY OF PROBABLE CAUSE ................................. 4

IV.     STATEMENT OF PROBABLE CAUSE .............................. 7

        A.   Background on the Subject Offenses................... 7

        B.   MAFI's Ties to the Iranian Government...............11

        C.   MAFI Brokers the Sale of Iranian Mohajer-6 Armed
             UAVs to Sudan for Over 60 million Euros.............18

        D.   MAFI Brokers the Sale of Aerial Bombs from Iran
             to Sudan...........................................28

        E.   MAFI and Co-Conspirator-1 Broker the Sale of AM-
             A-25 Bomb Fuses from the IRGC to Sudan..............31

        F.   MAFI and Co-Conspirator-1 Broker the Sale of AK-
             47 Rifles and Ammunition from Iran to Sudan.........38

        G.   MAFI's Contacts with U.S. Company-1 to Broker
             Defense Articles....................................45

        H.   Evidence of MAFI's Knowledge of U.S. Sanctions on
             Iran................................................50

        I.   OFAC License History Check..........................51

        J.   DDTC License History Check and Determinations.......52

        K.   MAFI's Use of the Subject Premises..................53

V.      TRAINING AND EXPERIENCE REGARDING THE SUBJECT
        OFFENSES ................................................56

VI.     TRAINING AND EXPERIENCE REGARDING DIGITAL DEVICES.......61

VII.    CONCLUSION ..............................................67

**AFFIDAVIT**

I, ██████████████, being duly sworn, declare and state as follows:

### I.     INTRODUCTION

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Shamim MAFI for a violation of 50 U.S.C. § 1705(a), (c) (Conspiracy to Violate the International Emergency Economic Powers Act).

2.    This affidavit is also made in support of search warrants for the following:

a.    The premises located at ████████████████ Woodland Hills, California ████, as described more fully in Attachment A-1 ("SUBJECT PREMISES"); and

b.    The person of MAFI, as described more fully in Attachment A-2.

3.    The items to be seized are described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of 50 U.S.C. § 1705(a), (c) (International Emergency Economic Powers Act); 31 C.F.R. Part 560 (Iranian Transactions and Sanctions Regulations); 22 U.S.C. § 2778 (Arms Export Control Act); 22 C.F.R. Part 120 (International Traffic in Arms Regulations); and 18 U.S.C. § 371 (Conspiracy to Violate 22 U.S.C. § 2778) (together, the "Subject Offenses"). Attachments A-1, A-2, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon a review of search warrant returns, my personal observations, my training and experience, and information obtained from other

agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all my knowledge of, or investigation into, this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and dates and amounts are approximations, and the words "on or about" and "approximately" are omitted for clarity. In addition, some of the documents and conversations referenced in this Affidavit were in Farsi and have been translated into English using machine translation.

## II.   BACKGROUND OF THE AFFIANT

5.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since May 2018. I am currently assigned to the Iran Counterintelligence Squad of the FBI's Los Angeles Field Office which investigates individuals, groups, or organizations that may be furnishing national defense, foreign policy, sensitive economic, or technological information to foreign powers or engaging in intelligence or other threat activities under foreign direction or control. During my career as an FBI Special Agent, I have participated in numerous counterintelligence and counterproliferation investigations focused on Iran and have received both formal and informal training that has helped me learn about the extraterritorial intelligence capabilities of Iran. As a result, I am familiar with the operations, capabilities, and tradecraft of intelligence officers working

within Iran's Ministry of Intelligence and Security. Additionally, I have received both formal and informal training from the FBI and other institutions regarding electronic communications and the use of the Internet and digital devices in furtherance of the extraterritorial intelligence activities of hostile foreign powers, including Iran. I have also participated in the review of digital evidence obtained pursuant to search warrants.

6.    I have received formal and informal training from the FBI and other institutions in counterproliferation operations, which includes training on the techniques and strategy used by illicit procurement networks, terrorist groups, and hostile foreign powers to obtain military products, sensitive dual-use technology, and/or weapons of mass destruction from both witting and unwitting entities in the United States and abroad. This training has also included training on United States export laws and regulations. Furthermore, I have participated in numerous investigations involving subjects' use of electronic communications to assist in gathering intelligence for hostile foreign powers and/or attempting to obtain military products, sensitive dual-use technology, and/or weapons of mass destruction for those same foreign powers. I am also fluent in Farsi.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    Shamim MAFI conspired with others to perpetrate an unlawful scheme to broker the sale of weapons, weapons components, and ammunition on behalf of the Government of Iran,

4

in violation of the International Emergency Economic Powers Act and the Arms Export Control Act. The items that MAFI brokered and/or attempted to broker included armed unmanned aerial vehicles ("UAVs"), bombs, bomb-fuses, assault weapons, and millions of rounds of ammunition. MAFI is a lawful permanent resident in the United States who maintains a residence in Woodland Hills, California, and travels frequently to Iran, Turkey, Oman, and other countries.  As set forth below, MAFI executed her illegal weapons brokering scheme from multiple locations, including within the Central District of California.

8.    MAFI and Co-Conspirator-1 own and operate an Omani company, Atlas International Business LLC ("Atlas International," also known as "Atlas Global Holding" and "Atlas Tech LLC").[1] As recently as early 2025, MAFI brokered weapons deals on behalf of Iran through Atlas International, according to records obtained pursuant to a search warrant. For example, MAFI facilitated a contract valued at over €60 million for the sale of Iranian-made Mohajer-6 armed UAVs from Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL") to the Ministry of Defense of the Republic of Sudan. MAFI coordinated the Sudanese delegation's travel to Iran, received over €6 million in payments, and issued payment receipts under the contract. Separately, MAFI, with Co-Conspirator-1's assistance, brokered the sale of 55,000 bomb fuses to the Sudanese Ministry of

---

[1] Based on my review of records obtained pursuant to a search warrant, Atlas International is a limited liability company registered on November 28, 2022, in Oman. Atlas International's registration number is 1459420. MAFI and Coconspirator-1 are each 50% shareholders of the company.

Defense. In connection with the transaction, MAFI submitted a letter of intent to Iran's Islamic Revolutionary Guard Corps ("IRGC") to purchase the bomb fuses for Sudan.  MAFI and Co-Conspirator-1 also brokered the sale of millions of rounds of ammunition from Iran to Sudan.

9.  At no time did MAFI apply for or obtain the requisite licenses from the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") to engage in any transaction or dealing in or related to goods or services of Iranian origin or owned or controlled by the Government of Iran, or to transact with Specially Designated Nationals and Blocked Persons ("SDNs") such as MODAFL and the IRGC. Similarly, at no time did MAFI register with, or apply for or obtain a license or written approval from, the U.S. Department of State, Directorate of Defense Trade Controls ("DDTC") to engage in brokering activities with respect to U.S. or foreign defense articles.

10.  During interviews with U.S. Customs and Border Control ("CBP") officers and the FBI, MAFI acknowledged communicating with an officer of Iran's Ministry of Intelligence and Security ("MOIS Officer-1"). MAFI stated that she is "more useful to them [i.e., MOIS] in Iran than in the United States," and records obtained pursuant to a search warrant show approximately 62 bidirectional contacts between MAFI and MOIS Officer-1's phone numbers between December 2022 and June 2025.

11.  The SUBJECT PREMISES is MAFI's home in Woodland Hills, California. As set forth below, the SUBJECT PREMISES is listed on MAFI's driver's license as her address, and MAFI was seen

6

traveling into the condominium complex that contains the SUBJECT PREMISES as recently as Monday, April 13, 2026. Because MAFI is scheduled to leave the United States from the Los Angeles International Airport ("LAX") later today, I am also seeking a warrant to search MAFI's person and bags. For the reasons set forth below, I believe both locations are likely to contain evidence and instrumentalities of the Subject Offenses.

## IV.   STATEMENT OF PROBABLE CAUSE

### A.   Background on the Subject Offenses

#### i.   International Emergency Economic Powers Act

12.   The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 et seq, authorizes the President to impose trade sanctions on a foreign country in response to unusual and extraordinary threats to the national security, foreign policy, and economy of the United States presented by that country. Beginning in 1995, by Executive Orders and pursuant to the authority in the IEEPA, the President imposed such sanctions on Iran. Among those sanctions are the Iranian Transactions and Sanctions Regulations ("ITSR"), which were promulgated under the authority of the President's Executive Orders and the IEEPA, and which are administered by OFAC. See 31 C.F.R. Part 560.

13.   Under the ITSR, unless a person obtains an export license from OFAC, or unless an export transaction falls within a limited set of enumerated general licenses or authorizations, goods, technology, and services may not be exported, reexported,

sold, or supplied, directly or indirectly, from the United States, or by a United States person, wherever located, to Iran.

14. Specifically, Title 31, Code of Federal Regulations, Section 560.206 prohibits a United States person from transacting or dealing in goods or services owned by the Government of Iran, as set forth below:

(a) Except as otherwise authorized pursuant to this part . . . , no United States person, wherever located, may engage in any transaction or dealing in or related to:

(1) Goods or services of Iranian origin or owned or controlled by the Government of Iran; or

(2) Goods, technology, or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the Government of Iran.

(b) For purposes of paragraph (a) of this section, the term transaction or dealing includes but is not limited to purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing.

15. In addition, Section 560.204 of the ITSR prohibits the supply of goods or services to Iran, as set forth below:

Except as otherwise authorized pursuant to this part . . ., the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or

(b) Such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods,

8

technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

16.   Section 560.203 of the ITSR provides:

(a) Any transaction on or after the effective date that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this part is prohibited.

17.   Section 560.215 of the ITSR provides:

(a) Except as otherwise authorized pursuant to this part, an entity that is owned or controlled by a United States person and established or maintained outside the United States is prohibited from knowingly engaging in any transaction, directly or indirectly, with the Government of Iran or any person subject to the jurisdiction of the Government of Iran that would be prohibited pursuant to this part if engaged in by a United States person or in the United States.

(b)(1) For purposes of paragraph (a) of this section, an entity is "owned or controlled" by a United States person if the United States person (i) Holds a 50 percent or greater equity interest. . . .

18.   Pursuant to the IEEPA, 50 U.S.C. § 1705, it is a crime for a person to willfully commit, willfully attempt to commit, willfully conspire to commit, or willfully cause a violation of any license, order, regulation, or prohibition issued under the IEEPA.

ii.   <u>Arms Export Control Act</u>

19.   The Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, authorizes the President to control the export of Defense Articles deemed critical to the national security and

foreign policy interests of the United States.[2] AECA further authorizes the President to designate items as Defense Articles and to promulgate regulations governing their import and export. By executive order, the President has delegated this authority to the U.S. Department of State. Pursuant to that authority, the DDTC is charged with controlling the export and temporary import of designated Defense Articles and Defense Services. Under that delegation, DDTC promulgated the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120-130, to implement AECA. The items designated as Defense Articles are set forth in the United States Munitions List ("USML").

20. The USML covers, among other items, "[f]ully automatic firearms to .50 caliber (12.7 mm) inclusive" and "[g]renade launchers," 22 C.F.R. § 121.1, Category I; "Unmanned aerial vehicles (UAVs) specially designed to incorporate a defense article," id., Category VIII(a)(5); and "[f]uzes specially designed for articles enumerated in paragraph (a) of this category," id., Category IV(h)(25).[3]

21. In general, AECA prohibits willful violations of its provisions and of any regulations and rules issued under AECA. See 22 U.S.C. §§ 2778(b)(1)(A)(ii)(III), (c). These prohibitions

---

[2] Under the International Traffic in Arms Regulations, a "Defense Article" is any item or technical data designated in the United States Munitions list. 20 C.F.R. § 120.31(a). Unless otherwise provided, a "Defense Article" refers "to both U.S. and foreign origin defense articles and defense services described on the U.S. Munitions List." 20 C.F.R. § 120.39.

[3] As set forth below, these categories encompass several of the Defense Articles that MAFI sought to broker, including AK-47 rifles in fully automatic configurations with grenade launchers, Mohajer-6 armed UAVs, and AM-A-25 bomb fuses.

include brokering the sale of Defense Articles without registering or obtaining a DDTC license. Section 127.1(b) of the ITAR provides that it is unlawful:

> To engage in the business of brokering activities for which registration and a license or written approval is required by this subchapter without first registering or obtaining the required license or written approval from the Directorate of Defense Trade Controls. For the purposes of this subchapter, engaging in the business of brokering activities requires only one occasion of engaging in an activity as reflected in § 129.2(b) of this subchapter.

22.  Furthermore, according to § 129.7 of the ITAR, "[n]o person may engage in or make a proposal to engage in brokering activities that involve any country . . . referred to in § 126.1 without first obtaining the approval of the [DDTC]." Section 126.1, in turn, identifies Iran as subject to a policy of denial of any licenses and other approvals. See 22 C.F.R. § 126.1(a), (d)(1).

B.    **MAFI's Ties to the Iranian Government**

    i.    MAFI's Relationship with an Iranian Intelligence Officer

23.  Based on my review of CBP and FBI records and my involvement in this investigation, I know that MAFI was interviewed by either CBP or FBI personnel on approximately ten occasions between September 2021 and December 2024.

24.  Based on my review of a report of MAFI's interview on October 4, 2022, MAFI was born in Iran in 1981, and lived there until approximately 2013, when she relocated to Istanbul,

Turkey. MAFI said her first husband was an MOIS officer.[4] On October 18, 2016, MAFI became a lawful permanent resident ("LPR") of the United States.

25.   Based on my training and my review of publicly available information, MOIS is the intelligence arm of the Government of Iran. On several occasions, the U.S. government has imposed sanctions on MOIS and its leaders for actions taken against the interests of the United States and other nations.[5]

26.   Based on my review of California Department of Motor Vehicle records, MAFI has a California driver's license that was issued on September 22, 2022. The address listed on the license is the SUBJECT PREMISES. Law enforcement officers have conducted surveillance on MAFI in the Los Angeles area, and they have seen her entering the condominium complex that contains the SUBJECT PREMISES as recently as April 13, 2026.

27.   On December 14, 2023, I interviewed MAFI at Los Angeles International Airport ("LAX") when she was departing Los

---

[4] It is unclear when MAFI was married to her first husband but, based on the birth of a child from a subsequent marriage, I believe her first marriage occurred in the 1990s or earlier.

[5] See, e.g., Treasury Sanctions Iranian Ministry of Intelligence and Minister for Malign Cyber Activities, Treasury.gov (Sept. 9, 2022), https://home.treasury.gov/news/press-releases/jy0941 (designating MOIS "for engaging in cyber-enabled activities against the United States and its allies"); Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism, Treasury.gov (Feb. 16, 2012), https://home.treasury.gov/news/press-releases/tg1424 (designating MOIS "for its support to terrorist groups as well as its central role in perpetrating human rights abuses against the citizens of Iran and its role in supporting the Syrian regime as it continues to commit human rights abuses against the people of Syria").

Angeles to Istanbul, Turkey. Based on my involvement in that interview and my review of the report from that interview, I know that MAFI made the following voluntary statements during the interview:

a.   MAFI had been overseas to set up a business in Muscat, Oman. MAFI claimed that she formed a partnership with another individual in the United States to send medical supplies and medications to African countries through Oman.[6]

b.   MAFI described the financial channels that the Government of Iran used to evade U.S. sanctions. MAFI claimed to have extensive information about the Iranian financial system and money laundering channels used by the Government of Iran.

c.   MOIS Officer-1 was the stepfather of one of MAFI's close friends.[7] MOIS Officer-1 reportedly helped MAFI with a property dispute and with obtaining a military service exemption for MAFI's son, who had not completed his two-year mandatory military service. MAFI described having a good relationship with MOIS Officer-1.

d.   MAFI claimed that she did not recognize the names of two MOIS officers who had recently been designated by OFAC, adding that she knew only high-ranking MOIS officers. I interpret this statement as indicating familiarity with MOIS

---

[6] During the CBP interview, MAFI stated that she had upcoming travel to foreign nations to coordinate with the ministry of health in those nations.

[7] MOIS Officer-1 is referred to in various reports using slightly different spelling of his name. Based on my review of the reports, I believe these refer to the same individual and are alternate spellings of the same name.

leadership beyond the single officer (MOIS Officer-1) she had previously mentioned.

e.    MAFI denied that she had ever been asked by MOIS to conduct any activities in the United States, explaining that she was more useful to MOIS in Iran than in the United States. Based on my training and experience, I believe this admission that she is "more useful to MOIS in Iran than in the United States" is consistent with much of MAFI's activity I have learned about through my investigation, like her brokering weapons and UAV sales on behalf of Iran, which is described below. In addition, I believe MAFI's denial that she had been tasked by an MOIS officer to conduct activities in the United States implies that she has been tasked by an MOIS officer to do activity outside the United States, which may include the brokering activity described below.

28.  Based on my interview with MAFI on May 8, 2024, and my review of a report of that interview, I have learned the following:

a.    MAFI inherited properties from her father in Iran, which were seized by the Government of Iran in about 2020. MAFI reached out to her late father's friend, MOIS Officer-1, in order to recover the properties from the government. MOIS Officer-1 helped people repossess their seized properties in exchange for 60 percent of the property's value.

b.    MOIS Officer-1 told MAFI to open a business in Los Angeles to provide services to Iranian Americans whose properties were seized by the Government of Iran. MOIS Officer-1

14

offered to cover all startup costs of the business. Based on my training and experience, an MOIS officer's instruction to MAFI to establish a U.S.-based business using funds provided by the officer is consistent with MOIS directing MAFI's activities in the United States.

29.  On June 11, 2025, the Hon. Charles F. Eick, United States Magistrate Judge, authorized a warrant to seize and search the contents of an online computing service account believed to be used by MAFI for violations of 18 U.S.C. §§ 371, 554, and 951, and 22 U.S.C. § 2778.

30.  Based on my review of search warrant returns, reports of MAFI's interviews, and information provided by CBP, I learned that MOIS Officer-1 used at least the two Iranian phone numbers, referred to herein as "MOIS Phone Number-1" and "MOIS Phone Number-2."[8]

31.  Based on my review of search warrant returns, I have learned the following:

a.   MAFI was in direct bidirectional contact with MOIS Phone Number-1 approximately 16 times between March 22, 2025, and June 10, 2025. MAFI was in direct bidirectional contact with MOIS Phone Number-2 approximately 46 times between December 13, 2022, and February 17, 2024.

---

[8] Specifically, MOIS Phone Number-1 was saved in MAFI's contact list under MOIS Officer-1's first name and the first two initials of MOIS Officer-1's last name. MOIS Phone Number-2 contacted MAFI on February 17, 2024, and introduced himself using MOIS Officer-1's first name. Based on the content of the conversation and the nature of the contact, which was to set up an in-person meeting, I believe MOIS Phone Number-2 belongs to MOIS Officer-1.

b.    Based on my review of messages exchanged between MOIS Officer-1 and MAFI via text message and WhatsApp, including as recently as June 10, 2025, MOIS Officer-1 communicated with MAFI to schedule in-person meetings with her.

32.    On December 17, 2025, the Hon. Michael B. Kaufman, United States Magistrate Judge, signed an order authorizing agents to install a pen register and trap-and-trace device for various WhatsApp accounts, including a number ending in x4057, which MAFI identified as her phone number in an interview with CBP on September 1, 2021 ("MAFI's WhatsApp Account").[9] Based on my review of data obtained pursuant to the pen register order, between approximately December 31, 2025, and January 11, 2026, MAFI was in direct bidirectional contact with the MOIS Phone Number-1 approximately seven times.[10]

33.    In summary, MAFI has maintained a relationship with MOIS Officer-1 from at least December 2022 through January 2026. That relationship includes dozens of bidirectional contacts over that period, in-person meetings, and MOIS Officer-1's direction to MAFI to establish a U.S.-based business at his expense. MAFI separately admitted that her first husband was an MOIS officer, that she knows high-ranking MOIS officials, and that she is "more useful" to MOIS in Iran than in the United States.

---

[9] Judges also signed orders authorizing pen register and trap-and-trace devices for MAFI's WhatsApp Account in March 2025, June 2025, October 2025, and April 2026.

[10] Based on my review of a TECS report, MAFI was in the United States between December 31, 2025, and January 11, 2026.

      ii.     <u>MAFI's Appointment to a Senior Role in an Iranian Presidential Campaign</u>

34. Based on my review of search warrant returns, on June 28, 2024, the Secretary of the Headquarters for Ethnic, Tribal, and Religious Affairs of a particular Iranian presidential campaign ("Iran Candidate-1") sent MAFI a letter in Farsi appointing MAFI as the head of the Women's Headquarters for Ethnic, Tribal, and Religious Affairs of Iran Candidate-1's 2024 presidential campaign.[11]

35. Based on my training and experience regarding Iranian political structures, I understand that Iranian Presidential campaign managers and staff are appointed based on their association with the candidate and full support of the candidate's policies. The candidate must trust the appointee to promote their ideology and fully advocate for the candidate.

36. Accordingly, based on my training and experience, the appointment demonstrates that, as of mid-2024, senior Iranian political figures entrusted MAFI with an official role in advancing their interests. This level of trust is consistent with MAFI acting at the direction of Iranian government officials in other contexts, including the weapons brokering described below.

---

[11] Based on my review of publicly available information, Iran Candidate-1 is the current Speaker of the Parliament of Iran since 2020. He was also the Mayor of Tehran 2005 to 2017. Iran Candidate-1 was the chief of police from 2000 to 2005 and the head of Aerospace Force of the IRGC from 1997 to 2000.

17

C.   **MAFI Brokers the Sale of Iranian Mohajer-6 Armed UAVs to Sudan for Over 60 million Euros**

37.   As set forth below, search warrant returns show that in 2024, MAFI facilitated the sale of Iranian-made Mohajer-6 Armed UAV systems between MODAFL and the Ministry of Defense of Sudan.

38.   Based on my training and experience, I know that MODAFL is Iran's defense ministry and is responsible for defense research, development, and manufacturing, and supervises Iran's development and production of missiles, weapons, and military aerial equipment. The U.S. Department of State designated MODAFL as a proliferator of weapons of mass destruction on October 25, 2007, pursuant to Executive Order 13382. OFAC further designated MODAFL on March 26, 2019, as an SDN pursuant to Executive Order 13224 for assisting, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, Iran's Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF").

39.   Based on my review of the evidence obtained from search warrant returns, I have learned the following:

a.   On July 24, 2024, a Sudanese weapons broker ("Sudanese Representative-1") sent MAFI a WhatsApp message containing the text of a draft "Contract for the Purchase of M-6 Armed UAV Systems" (the "M-6 UAV Contract"). Based on my training and experience, I believe "M-6 Armed UAV Systems" refers to Iranian-made Qods Mohajer-6 ("M-6") UAVs, also known as drones. The photograph below, from a document obtained from

18

one of MAFI's online accounts pursuant to a search warrant, depicts an armed M-6 UAV:



b.     In subsequent messages on July 26, 2024, Sudanese Representative-1 asked MAFI whether she had completed the contract. MAFI replied, "Yes," and sent Sudanese Representative-1 a PDF version of the contract.

c.     On July 27, 2024, Sudanese Representative-1 sent MAFI a WhatsApp message containing the text of the "Final version" of the M6 UAV Contract. The message from Sudanese Representative-1 identified MAFI's Omani business, Atlas Tech LLC,[12] represented by MAFI, and the Ministry of Defense of the Republic of Sudan, represented by a Sudanese official ("Sudanese Representative-2"), as the parties to the agreement. The

---

[12] Based on my review of documents obtained pursuant to a search warrant, MAFI referred to her Omani company alternatively as Atlas International Business LLC, Atlas Tech LLC, and Atlas Global Holding, but I believe these all are the same company with the same Omani registration number (1459420).

contract specified that the Sudanese Ministry of Defense was agreeing to purchase four sets of M-6 Armed UAV Systems, which would include "all necessary components, ground control stations, equipment, spare parts, and comprehensive training programs."

       d.   On July 27, 2024, MAFI sent the text of the draft M-6 UAV Contract via WhatsApp to an associate at Atlas International ("Co-Conspirator-2") for review. Documents obtained from one of MAFI's online accounts pursuant to a search warrant identify Co-Conspirator-2 alternatively as Atlas International's "Chairman of Board" and "Vice President."

       e.   On September 6, 2024, Sudanese Representative-1 sent MAFI the signed M-6 UAV Contract. The contract provided that MAFI's company Atlas Global Holding would supply six M-6 UAVs, 30 UAV bomb release units, two ground control stations, 300 guided bombs, and other related equipment to the Ministry of Defense of Sudan. The total value of the contract was €61,656,000, to be paid by the customer in four installments. If the total amount was paid on time, Atlas International agreed to deliver an additional M-6 UAV system as an incentive. Later that day, MAFI replied to Sudanese Representative-1 that the contract had been "sent to the MoD," referring to the Ministry of Defense.

       f.   On November 12, 2024, Co-Conspirator-2 sent MAFI a letter setting a seven-day deadline for Sudanese representatives to travel to Iran to finalize the M-6 UAV Contract. Co-Conspirator-2 had signed the letter as Atlas

20

International's Chairman of the Board. In response, MAFI replied, "this is great." At the time of this exchange, MAFI was in the Central District of California.

g.   In another letter dated November 16, 2024, and signed by Co-Conspirator-2 as Atlas International's Vice President, Co-Conspirator-2 requested that the Sudanese Ministry of Defense make an advance payment under the contract in Turkey or the United Arab Emirates ("UAE"). Specifically, Co-Conspirator-2 wrote the following to Sudanese Representative-2 regarding the "Final conclusion of the contract":

> Please, before coming to the trip, if it is necessary to arrange the final meeting with the Ministry of Defense, we should deposit the advance payment and present the payment receipt as goodwill. Therefore, we are ready to receive advance payments in Turkey and UAE. Please specify the exact details by specifying the time of payment.

Based on my training and experience, I believe Co-Conspirator-2 intended to convey that Atlas International would accept payments in Turkey or the UAE, due to the need to evade U.S. financial sanctions on Iran.

h.   In another letter dated December 7, 2024, and signed by MAFI as Atlas International's Managing Director, MAFI wrote to the "Ministry of Defense of Sudan" regarding the "[i]ntroduction of representatives for final payment decision" regarding the M-6 UAV Contract. Specifically, MAFI requested that "[a]ccording to the final summary of the product and package m6 and considering the complexities of payment operations," MAFI and a Sudanese representative ("Sudanese Representative-3") "be approved for the final payment

21

decisions." MAFI further requested that Sudanese Representative-3 travel to Kish, Iran, within three to four days of receiving the letter "due to the time-consuming nature of the process." Based on my training and experience, and my review of records obtained pursuant to a search warrant, I believe that "package m6" is a reference to Mohajer-6 Armed UAVs, and MAFI's reference to "complexities of payment operations" is consistent with the challenges of routing payments to Iran in light of U.S. economic sanctions imposed on the Iranian financial sector.

i.   On January 3, 2025, Sudanese Representative-3 shared with MAFI a PDF copy of an email discussing the agenda for the Sudanese delegation's trip to Tehran from January 6 to 8, 2025. The agenda included "an internal meeting with ATLAS to finalize the contract amendment" and a "final meeting at the factory office to sign the contract amendment and proceed with the order." In the email, Sudanese Representative-3 requested that Atlas International "[c]oordinate with the manufacturer and ensure the goods are ready for inspection immediately upon releasing the advance payment, which is ready to be paid immediately after signing the contract."

j.   On January 4, 2025, Sudanese Representative-3 sent MAFI an End User Certificate issued by the Ministry of Defense of Sudan for the M-6 UAV Contract. The document was saved in one of MAFI's online accounts. The End User Certificate identified Atlas International as the exporter and the Sudanese Ministry of Defense as the "End User" of seven M-6 UAV Systems and four ground control stations. The End User Certificate

22

identified the country of origin of the M-6 UAV Systems as "Iran" and referenced "Contract No. 924749-01," dated October 1, 2024.[13]

k.   On January 7, 2025, Sudanese Representative-3 informed MAFI that he would meet her at a hotel in Tehran to "discuss and finalize the contract," and advised MAFI that "if we are going to meet here in our Hotel, it is better to bring your legal advisor with you." MAFI replied that she would attend with Co-Conspirator-2.

l.   Later on January 7, 2025, Sudanese Representative-3 sent MAFI an amendment to the M-6 UAV Contract. According to the amendment, the buyer of the M-6 UAVs was an Omani front company ("Omani Company-1"), on behalf of the government of Sudan, and the seller was Atlas Global Holding, represented by MAFI. The total value of the amendment to the contract was €30,828,000, and payments would be made to an account provided by MODAFL in the UAE or Turkey. Based on my training and experience, this is consistent with the government of Iran being the ultimate seller of the UAVs or at least a key party to the sale.

m.   On January 7, 2025, Sudanese Representative-3 also sent MAFI a "delegation letter" from the Sudanese Minister of Defense to the Iranian Minister of Defense, authorizing

---

[13] The M-6 UAV Contract required the customer to agree to "use the Equipment supplied under the Contract only for the stated purposes according to the END USER CERTIFICATE" and prohibited the customer from re-exporting or transferring the "the Equipment or information supplied under the Contract to third countries or to any third physical persons or legal entities of these countries."

23

Sudanese Representative-2 to "negotiate, finalize and sign the contract," as well as "[r]eceive and ship the goods." The letter was stamped with the date February 11, 2024.

n.   On January 11, 2025, MAFI instructed Sudanese Representative-3 to proceed with the first part of the payment for the contract, writing in a WhatsApp message, "I think you can start payment."

o.   On January 13, 2025, Sudanese Representative-3 wrote to MAFI via WhatsApp that he had asked Co-Conspirator-2 "to send me the ID & phone number" for the person specified in the M-6 UAV Contract as the recipient of all payments. The following day, after several calls between MAFI and Sudanese Representative-3, MAFI sent Sudanese Representative-3 the contact information for a Turkish money exchange. Sudanese Representative-3 asked MAFI to "[p]lease ask your exchange to call [a number Sudanese Representative-3 provided] and ensure 2.7 million Dollar is available." Sudanese Representative-3 informed MAFI that "[m]eanwhile I will arrange someone to take the cash and deposited to your exchange account." Based on my training and experience, I believe this reflects the first installment of Sudan's payment under the M-6 UAV Contract.

p.   On January 15, 2025, MAFI, as Atlas International's Managing Director, issued a payment receipt in the amount of $995,900. Specifically, MAFI wrote the following:

> Dear Sir,
>
> The amount 995,900 $(USD) of the contract number 924749-02 amendment No.1 with ATLAS international business LLC and [Omani Company-1] in the [Turkish money exchange] was received by the ATLAS company.

24

Based on my review of records obtained from one of MAFI's online accounts, I believe that "contract number 924749-02" refers to the M-6 UAV Contract.

q.    In a letter dated January 23, 2025, MAFI wrote to Omani Company-1 to "confirm receipt of the payment of $2,000,000 in accordance with the terms of the agreement referenced Contract No.924749-01/Amendment No.1." MAFI noted that Atlas International had received the payment on January 23, 2025.

r.    Based on my review of records obtained from one of MAFI's online accounts, MAFI had a copy of a letter dated January 12, 2025, from MODAFL's Deputy Directorate of International Affairs to the Sudanese Ambassador to Iran. In the letter, MODAFL's Deputy Director of International Affairs wrote in Farsi as follows (according to a machine translation):

> In view of the negotiations held with Aerospace Industries Organization management and the expressed desire to purchase of Mohajer-6 drones, and the need to guarantee the payment for the sale of the drones, we hereby inform you that the contract for the sale of military equipment No. 924749-02 and its annex will be enforceable upon advance payment within 2 days from the date of sending the letter.

The letter was appended to the fully executed M-6 UAV Contract (contract no. 924749-02). According to OFAC, MODAFL has ultimate authority over Aerospace Industries Organization, which was added to the SDN List pursuant to Executive Order 13382 on June 29, 2005.[14]

---

[14] See https://home.treasury.gov/news/press-releases/hp644; https://ofac.treasury.gov/recent-actions/20050629 (last visited Apr. 12, 2026).

s.   On January 22, 2025, MAFI sent Sudanese Representative-3 a letter via WhatsApp authorizing Omani Company-1 to deliver a cash payment of $3,631,381 to a currency exchange in Dubai, UAE.

t.   On January 24, 2025, Sudanese Representative-3 sent MAFI a letter via WhatsApp informing MAFI that in accordance with the requirements of the M-6 UAV Contract, MAFI was "required to make necessary arrangements" with MODAFL to support the training program for the M-6 UAVs, including arranging for Iranian visas and any other requirements to enable the Sudanese team "to complete their mission." The letter attached a list of 12 Sudanese nationals selected to travel to Iran to receive UAV training. The list was signed and stamped by the Armed Forces of the Republic of Sudan.

u.   On February 13, 2025, a representative of a currency exchange located in Dubai, UAE ("UAE Currency Exchange-1") sent MAFI a photograph via WhatsApp of a letter providing MAFI with a breakdown of payments received by the UAE Currency Exchange on Atlas International's behalf. According to the letter, UAE Currency Exchange-1 had received €3,434,024 from Sudanese Representative-3, had made two cash payments at MAFI's instruction, and had a remaining balance (before UAE Currency Exchange-1's commission) of 51,497 euros.

v.   On February 26, 2025, MAFI sent Co-Conspirator-1 the signed contract 924749-02 between Atlas Global Holding and the Ministry of Defense of Sudan via WhatsApp. Later that day, MAFI sent Co-Conspirator-1, via WhatsApp, photographs and a

26

video showing the opening of a large crate containing 100-dollar bills, as shown below:



Based on my review of Atlas International's Omani registration documents and other records, Co-Conspirator-1 is MAFI's business partner and a 50% owner of Atlas International.

w.   In a letter dated April 2, 2025, Omani Company-1 informed Atlas International that it was "preparing to release the balance 80% payment through bank transfer from Dubai . . . to your authorized agent [UAE Currency Exchange-1]" and requested that Atlas International provide the UAE Currency Exchange-1's bank account number. The letter also stated that Omani Company-1 would transfer €23,889,556 to UAE Currency Exchange-1, after deducting the advance payment of €6,167,713 and its 2.5% commission. A second letter dated April 2, 2025,

27

from Omani Company-1 to Atlas International provided an accounting of Omani Company-1's payments made to date.

x.    On April 18, 2025, MAFI exchanged a series of voice messages with Co-Conspirator-2, in which MAFI informed Co-Conspirator-2 that she had received $2,000,000 from Sudanese Representative-3 and that she had another meeting to discuss "136." Based on my training, experience, and the knowledge of the case, I believe the term "136" is a reference to Iranian-made Shahed-136 drones. Co-Conspirator-2 advised MAFI against disclosing the contract details to anyone. Co-Conspirator-2 told MAFI he would send the UAV information and asked MAFI to delete the message after saving the information.

y.    On or around May 20, 2025, Co-Conspirator-2 sent MAFI a proposal for the sale of 500 B4-H kamikaze UAVs from Iran Aircraft Manufacturing Industries ("HESA") for an unidentified end user. According to OFAC, HESA is a state-owned subsidiary of MODAFL that manufactures Iran's military aircraft and Ababil-series UAVs, which have been employed by the IRGC.[15] On September 17, 2008, OFAC added HESA to the SDN List pursuant to Executive Order 13382.[16]

## D.    MAFI Brokers the Sale of Aerial Bombs from Iran to Sudan

40.    During my review of one of MAFI's online accounts, I discovered that MAFI had a sales brochure on the letterhead of a

---

[15] See https://home.treasury.gov/news/press-releases/sb0217.

[16] See https://www.federalregister.gov/documents/2008/10/28/E8-25600/additional-designation-of-entities-pursuant-to-executive-order-13382.

28

Turkish defense company ("Turkish Company-1"). The brochure stated that Turkish Company-1 "is one of the largest all-round defence manufacturers and suppliers in Turkey." Among the products listed in the 352-page brochure were "NON GUIDED BOMBS," including OJAN-500 "air-drop dump bombs," which the brochure stated "can be used to destroy enemy industrial sites, buildings, fortifications, trenches, railway stations, aircraft hangers, . . . and to kill enemy forces in open areas." An image of an OJAN-500 aerial bomb and its technical specifications from the brochure is depicted below:

| Main Technical Parameters | | | | | | |
|---|---|---|---|---|---|---|
| Type of bomb | Ojan-250 | Ojan-500 | OFAB-100-120 | OFAB-250-270 | Training OFAB | SB Bomb |
| Type of aircraft | Eastern fighters | Eastern fighters | Eastern fighters | Eastern fighters | Eastern fighters | UAV |
| Warhead type | Blast | Blast | Fragmentation | Fragmentation | Illuminator | Blast |
| Length (mm) | 1920 ± 10 | 2430 ± 10 | 1040 ± 5 | 1423 ± 10 | 1040 ± 5 | 670 ± 5 |
| Diameter (mm) | 300 ± 5 | 300 ± 5 | 273 ± 5 | 325 ± 5 | 273 ± 3 | 112 ± 2 |
| Weight (kg) | 227 ± 4 | 502 ± 5 | 123 ± 5 | 268 ± 10 | 120 ± 4 | 10 ± 2 |
| Fin span (mm) | 370 | 370 | 340 | 410 | 344 | 148 ± 4 |
| Lugs span (mm) | 250 | 250 | ----- | 250 | Single lug | Without lug |
| Explosive | H6 | H6 | TNT | TNT | TNT | H6 |



OJAN-250,                OJAN-500,

Based on my training and experience, as well as my review of the website of Iran's Ministry of Defense Export Center ("MINDEX") (mindex-center.ir), I believe that the OJAN-500 is an Iranian, non-guided, air-dropped high-explosive aerial bomb designed for use against various ground targets.

29

41. According to an End User Certificate obtained from one of MAFI's online accounts pursuant to a search warrant, the Ministry of Defense of the Republic of Sudan certified that MODAFL "has been contracted by [a Sudanese front company] to procure [500 OJAN-500 aircraft bombs] from The Government of the Islamic Republic of Iran. These products are for the exclusive use in wars by Sudanese armed forces." The End User Certificate was dated January 21, 2025, and signed by Sudan's Minister of Defense on behalf of the Sudanese Ministry of Defense.

42. On March 12, 2025, MAFI sent a copy of an offer letter to Co-Conspirator-2 via WhatsApp. The letter, signed by MAFI as Atlas International's Managing Director, was addressed to Sudanese Representative-2, who as set forth above was an authorized representative of the Sudanese Ministry of Defense. The letter stated, "[p]lease note that currently 500 units of the product (OJAN-500, aircraft bomb) can be shipped at a price of 5,500 euros per unit. Also, the first part will be supplied from China and the subsequent parts will be supplied from Iran from mid-2025."

43. Based on my review of a CBP report of an interview with MAFI, I have learned the following:

a. On December 2, 2024, CBP employees did a secondary inspection of MAFI when she was traveling from the United States to Turkey.

b. During the interview with CBP employees, MAFI stated that she was supposed to meet a business partner in Turkey, whom she had known for many years and for whom she used

30

to work as an interpreter. MAFI stated her business partner worked for Turkish Company-1, a Turkish defense company. MAFI stated she had previously met twice with this individual in Iran, where she introduced him to Iranian firms. MAFI further claimed that this individual was able to acquire Iranian Shahed drones, which he sent to Ukraine.[17]

      c.   MAFI stated she would host her business partner at a Las Vegas defense show in early 2025. MAFI further stated that many Turkish defense firms acquired their technology from Iran, purchasing Iranian military equipment and then reverse-engineering it for mass production.

**E.   MAFI and Co-Conspirator-1 Broker the Sale of AM-A-25 Bomb Fuses from the IRGC to Sudan**

44.  As described below, during the same period that MAFI was brokering the M-6 UAV Contract described in Section IV.C, she was simultaneously facilitating a separate deal to purchase bomb fuses from the IRGC for the Sudanese Ministry of Defense.

45.  Based on my training and experience, as well as publicly available information, I know that the IRGC plays a key role in Iran's development of ballistic missiles and Iran's support for international terrorism and foreign terrorist organizations, and the IRGC exercises significant control and influence over the Iranian economy. The U.S. Department of State

---

[17] Based on my review of public reporting, Iranian Shahed drones have been used in the Russia-Ukraine war, namely by Russian forces against Ukrainian forces. See "Ukraine Says Russia Launched 8,060 Iran-developed Drones During War," Reuters (Sept. 13, 2024), https://www.reuters.com/world/europe/ukraine-says-russia-launched-8060-iran-developed-drones-during-war-2024-09-13/

designated the IRGC as a proliferator of weapons of mass destruction on October 25, 2007, pursuant to Executive Order 13382. OFAC further designated the IRGC as a Specially Designated Global Terrorist on October 13, 2017, under Executive Order 13224, for its role in supporting the terrorist activities of the IRGC-QF. In addition, on April 15, 2019, the U.S. Department of State designated the IRGC as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act for the IRGC's direct involvement in terrorist plotting, support for terrorism, and hostage-taking.

46. Based on my review of the evidence obtained from search warrant returns for one of MAFI's online accounts, I have learned the following:

a. On May 28, 2024, Sudanese Representative-2 sent the following photograph to MAFI via WhatsApp:



MAFI replied to Sudanese Representative-2 stating that 40,000 pieces were available at $57 USD per unit. Later the same day, Sudanese Representative-2 sent MAFI a "Request for Quotation" letter from a Sudanese front company ("Sudanese Company-1") to

Atlas International. The letter issued by Sudanese Company-1 was a price request for 30,000 units of "AM-A." The photograph shown above was in the letter as a reference. Based on my review of publicly available information, I believe the photograph above and term "AM-A" refer to AM-A bomb fuses, which one source describes as being used with "aircraft-bombs of various weights to 50kg (110lbs) and with certain older rockets."[18]

b.   On May 29, 2024, MAFI sent Sudanese Representative-2 the photographs shown below, which contain technical specifications for AM-A bomb fuses:



The photographs bear the logo of Iran's Defense Industries Organization ("DIO").

---

[18] "AM-A Fuze," cat-uxo.com, https://cat-uxo.com/explosive-hazards/fuzes/am-a-fuze (last visited March 31, 2026).

c.    According to OFAC, DIO is an entity controlled by MODAFL.[19] On March 30, 2007, the U.S. Department of State designated DIO under Executive Order 13382 "for engaging in activities that have materially contributed to the development of Iran's nuclear and missile program," and OFAC added DIO to the SDN List.[20]

d.    On June 8, 2024, MAFI sent Sudanese Representative-2 a letter from Atlas International stating that 55,000 units were available at $57 per unit. MAFI also requested an end user certificate to be emailed to start the process.

e.    On June 24, 2024, MAFI sent Sudanese Representative-1 a letter from a company based in Tehran, Iran ("Iranian Company-1") to Atlas International, which stated that 55,000 pieces of AM-A-25 were available at $57 per unit. The letter was signed by Iranian Company-1's General Director.

f.    On June 26, 2024, MAFI sent Sudanese Representative-1 a letter from Iranian Company-1 requesting advance payment in reference to contract 03/106/3030301, dated June 19, 2024, to a currency exchange in Turkey. Based on my training and experience, the use of an exchange entity in a third country to transfer money is a method commonly employed to evade financial sanctions and to minimize traceable transactions. MAFI's repeated use of informal exchange entities

---

[19] See https://home.treasury.gov/news/press-releases/tg747 (last visited Apr. 12, 2026).

[20] See https://2001-2009.state.gov/r/pa/prs/ps/2007/mar/82487.htm (last visited Apr. 12, 2026)

across multiple transactions is consistent with a deliberate effort to structure payments to evade U.S. sanctions.

g.   On July 2, 2024, MAFI sent a letter to Sudanese Company-1 requesting a $300,000 USD deposit for the contract dated June 25, 2024, referring to the contract to sell bomb fuses to Sudan (the "Bomb Fuses Contract").

h.   In a letter dated July 19, 2024, Sudanese Company-1 wrote that it was "ready to pay an amount of USD 50,000 . . . as a token advance." Sudanese Company-1 also requested that the contract be amended with new payment terms.

i.   On July 29, 2024, MAFI received a WhatsApp message from an Egyptian national appointed to represent Defense Industries System, a Sudanese defense contractor, in the negotiation and signing of the Bomb Fuses Contract ("Sudanese Representative-4"). OFAC designated Defense Industries System as an SDN on June 1, 2023, pursuant to Executive Order 14098 for being responsible for, or complicit in, or having directly or indirectly engaged or attempted to engage in actions or policies that threaten the peace, security, or stability of Sudan. The message was a photograph of a cash transfer receipt in the amount of 183,500 AED.

j.   In August 2024, MAFI had ongoing communications with the Sudanese representatives to coordinate their trip to Iran to sign the Bomb Fuses Contract. MAFI sent an entry visa to Sudanese Representative-2 and his associates to facilitate their travel to Iran. MAFI also instructed Sudanese Representative-3 not to discuss the contract over the phone.

35

k.    On August 2, 2024, MAFI sent Co-Conspirator-2 a draft letter containing instructions for the Sudanese buyers' upcoming trip to Tehran, Iran. The draft letter provided that the first meeting would be "to inspect the fuses and complete the contract and pay the advance payment"; "on the second day, the group related to the purchase of fuses can return to their country;" and the third day would be "dedicated to review the requests of the Ministry of Defense and specialized meetings," as well as "reviewing and summarizing the contract."

l.    On August 12, 2024, MAFI exchanged a series of WhatsApp voice messages in Farsi with an Iranian co-conspirator ("Co-Conspirator-3"). In the voice messages, MAFI and Co-Conspirator-3 discussed the Bomb Fuses Contract. Co-Conspirator-3 told MAFI to send an Arabic-speaking driver to pick up the Sudanese guests from Salam Airport, take them to their hotel, and then bring them to a meeting at Iranian Company-1's office before inspecting the items. Co-Conspirator-3 also relayed the substance of a conversation he had with Iranian Company-1's General Director. According to Co-Conspirator-3, Iranian Company-1's General Director said that only the IRGC, not MODAFL, had the bomb fuses the parties were seeking, and that the fuses were stored in an IRGC warehouse. Iranian Company-1's General Director informed Co-Conspirator-3 that, unlike MODAFL, the IRGC did not allow women or unauthorized personnel to visit its facility, and that obtaining permission for MAFI to visit the facility would take approximately one week. If Iranian Company-1 could not secure the approval, Iranian Company-1's

36

General Director said that he would accompany the Sudanese delegation to the warehouse himself.

m.   Later on August 12, 2024, MAFI sent a message to Co-Conspirator-1, asking him to attend the inspection in MAFI's place, since women were not permitted to enter the IRGC facility.

n.   That same day, MAFI sent a message to Sudanese Representative-4 and provided travel guidelines to the Sudanese delegation. Specifically, MAFI wrote:

> Considering the sensitive condition in the region and due to the sensitivity of the topic of meetings in Tehran, I feel it's necessary to announce all protocols for your trip in letter before your arrival.
>
> [. . .]
>
> The first meeting will place to inspect the fuses and complete the contract and pay the advance payment. On the second day, the group related to the purchase of fuses can return to their country. The third day is dedicated to review the requests of the Ministry of Defense and specialized meetings. . . . Remaining of third day will be dedicated to reviewing and summarizing the contract.

Based on my training and experience, MAFI's references to "sensitive condition in the region" and "sensitivity of the topic" reflect her awareness that the transactions were illicit.

o.   In a letter in Farsi dated September 10, 2024, from Atlas International to the IRGC's Deputy Directorate of Readiness and Support, MAFI requested authorization for the export of AM-A-25 bomb fuses. Specifically, based on a machine translation of the letter, MAFI wrote that Atlas International was ready to supply the AM-A-25 bomb fuses to the country of Sudan, and to purchase/export the items in accordance with the

37

laws of the Islamic Republic of Iran. MAFI requested that the IRGC issue the necessary instructions for preparing a sales contract.

p.    MAFI possessed a letter dated September 23, 2024, from DIO to MODAFL's Directorate of the Export Section. In the letter, DIO wrote, in substance and based on a machine translation, that it was responding to Atlas International's request to purchase AM-A-25 fuses, following Atlas International and Iranian Company-1's visit to a MODAFL product exhibition. DIO informed MODAFL's Directorate of the Export Section that the AM-A-25 bomb fuses would cost $385 per unit, and that a valid end user certificate and 100% advance payment were required to proceed with the deal.

**F.    MAFI and Co-Conspirator-1 Broker the Sale of AK-47 Rifles and Ammunition from Iran to Sudan**

47.    Search warrant returns show that MAFI and Co-Conspirator-1 brokered and attempted to broker sales of AK-47 machine guns and ammunition to the Sudanese Ministry of Defense.

48.    Based on my review of the evidence obtained from search warrant returns, I have learned the following:

a.    On August 7, 2024, Sudanese Representative-1 sent MAFI a draft contract via WhatsApp to supply military equipment and ammunition to the Ministry of Defense of Sudan. Among other things, the draft contract included 70,000 AK-47s, 10 million rounds of 7.62x39mm ammunition, 1,000 rocket-propelled grenade

launchers, 500,000 rockets, and other equipment and ammunition.[21] The draft contract listed the seller as Atlas International, represented by MAFI, and the buyer as the Ministry of Defense of Sudan, represented by Sudanese Representative-2. On August 9, 2024, Sudanese Representative-1 asked MAFI if she could supply the military equipment and ammunition mentioned in the draft contract. MAFI replied "yes."

b.   On August 11, 2024, Sudanese Representative-1 sent MAFI an urgent request for 10 million rounds of AK-47 ammunition with a total value of $3,500,000. Sudanese Representative-1 stated the money was ready at a currency exchange in Dubai. MAFI replied that Sudanese Representative-1's team was clear to travel to Iran.

c.   On August 13, 2024, Sudanese Representative-2 sent MAFI an end user certificate for 10 million rounds of 7.62x39mm ammunition, signed by the Secretary General of the Sudanese Ministry of Defense. The following day, Sudanese Representative-1 sent MAFI a copy of the same end user certificate.

d.   On August 24, 2024, MAFI informed Sudanese Representative-1 that 10 million rounds of ammunition were ready, and the sale would be arranged through MAFI's company in Turkey.

49.   In addition, MAFI and Co-Conspirator-1 brokered or attempted to broker the sale of hundreds of millions of rounds

---

[21] That same day, MAFI left a voice message for Sudanese Representative-1 instructing him to delete his WhatsApp message. Specifically, MAFI said, "get it and delete it."

of ammunition to Sudan. Specifically, based on my review of evidence obtained from search warrant returns, I have learned the following:

a.   On August 23, 2024, Sudanese Representative-1 sent a WhatsApp message to MAFI and Co-Conspirator-2 regarding "the urgent request for Kalashnikov ammunition." Sudanese Representative-1 continued:

> I am pleased to inform you that we are in a position to proceed with a contract for the supply of *250 million rounds* over a period of six months, with a *monthly delivery of 30 million rounds*. However, given the urgency of the situation, we kindly request that a minimum of 5 million rounds be delivered within three days as a prerequisite.

Sudanese Representative-1 requested MAFI and Co-Conspirator-2's "swift attention to this matter . . ., as the timely delivery of this initial batch is critical."

b.   On August 24, 2024, MAFI sent Sudanese Representative-1's message to Co-Conspirator-1.

c.   On September 2, 2024, MAFI sent the following photographs to Sudanese Representative-2, who was the Ministry of Defense of Sudan's authorized representative:

  

  

     d.   On September 4, 2024, MAFI asked Co-Conspirator-1 to review the contract for the supply of 240 million rounds of ammunition to the Ministry of Defense of Sudan.

     e.   On September 5, 2024, Sudanese Representative-1 sent MAFI the signature pages of the contract for the supply of 240 million rounds of 7.62x39mm AK-47 ammunition, to be delivered in monthly shipments of 20 million rounds. The contract, which was signed by Sudanese Representative-2 on

41

behalf of the Sudanese Ministry of Defense and by MAFI on behalf of Atlas Global Holding, was for $100,800,000.

f.   On September 7, 2024, Co-Conspirator-1 sent MAFI a WhatsApp message with guidance regarding the payment for the AK-47 Ammunition contract. Specifically, Co-Conspirator-1 wrote the following:

> In general, it is possible for the buyer to pay the amount of the contract at any stage or in general through exchange solutions, and this is important due to sanctions and other issues. I repeat again that any delivery and transformation in the sovereign territory of Sudan can be their responsibility because you have no power and possibility there.

Based on my training and experience, the phrase "through exchange solutions" refers to informal money transfer mechanisms, such as currency exchanges or hawalas, which operate outside the regulated banking system and are commonly used to circumvent sanctions. Similarly, I believe that the phrase "this is important due to sanctions and other issues" shows Co-Conspirator-1 acknowledging that payment through traditional banking systems would be halted due to U.S. sanctions.

g.   On September 7, 2024, MAFI replied to Sudanese Representative-1 via WhatsApp message and provided him with the same payment guidance she had received from Co-Conspirator-1.

50.  MAFI and Co-Conspirator-1 also brokered or attempted to broker the sale of AK-47 rifles, PK machine guns, and ammunition from Iran to Sudan. Specifically, based on my review of the evidence obtained from search warrant returns, I have learned the following:

42

a.   On August 24, 2024, Co-Conspirator-1 sent MAFI the following price quote:

Ak=920$, Ammunition= 60/5 cent; Pk= 3600$, Ammunition= 2.90$.

Based on my training and experience, I believe this message shows Co-Conspirator-1 quoting the price of AK-47 rifles ($920), AK-47 ammunition (60/5 cent, which I understand to mean $0.605 per round), PK machine guns ($3600), and PK ammunition ($2.90).

b.   MAFI issued two letters dated August 31, 2024, to MODAFL's Directorate of the Export Section. In the letters, which were saved in one of MAFI's online accounts, MAFI requested a price list and delivery procedures for, among other things, 10 million rounds of 7.62*39mm ammunition, 200 PK machine guns, and 2 million rounds of PK ammunition for the country of Sudan. MAFI attached an end user certificate she received from Sudanese Representative-2.

c.   On September 10, 2024, in response to MAFI's letters, DIO issued a letter providing a price list for, among other things, 10 million rounds of 7.62*39mm ammunition, 2 million rounds of AKAT ammunition, 200 PK machine guns, and 2 million rounds of PK ammunition. The letter also provided payment instructions for delivery in Tehran.

d.   On October 21, 2024, a member of the Sudanese delegation sent MAFI a WhatsApp message stating that "we are now transferring the amount to our account in Turkey and then we will transfer the equivalent of 50% of the contract value to

43

your account." The Sudanese representative advised that the process would take several days to complete. MAFI replied:

> I think you should go to the cash transfer process. I know it will be very sensitive. I[t] should be in small amounts. In turkey we can just accept in exchange. And it should be in cash.

Based on my training and experience, I believe MAFI's instruction to use small cash amounts reflects an effort to avoid triggering reporting thresholds or detection mechanisms that could expose the sanctions violations. She explained that later ("In turkey") they will be able to use an informal money exchange ("in exchange").

e.    MAFI possessed a draft contract, dated December 7, 2024, that provided that Atlas Global Holding would supply "5,000,000 rounds of 7.62*39mm AK-47 ammunition and 5,000 AK machine" to Omani Company-1.

f.    In a letter dated December 7, 2024, Sudanese Representative-3 wrote to MAFI on behalf of Omani Company-1 regarding the contract for the supply of AK-47 machine guns and ammunition. Sudanese Representative-3 referenced a "discussion between our teams" in Kish, Iran, "last week," and asked MAFI to address several points that had been discussed with Co-Conspirator-3. These points included delivery in Port Sudan, adding an "AK Machine gun warranty," and that Omani Company-1 would not have to provide an end-user certificate. Sudanese Representative-3 asked MAFI to modify the draft contract in accordance with these points and confirmed Omani Company-1's "readiness to come and meet you in KISH to sign the contract and

44

proceed with the order within 4 – 5 days from your confirmation."

g.    A revised contract dated December 11, 2024, which was unsigned, provided that Atlas Global Holding would supply Omani Company-1 "with a total of 5,000 AK machine" for a total price of $2,000,000. The amended contract adopted the changes requested by Omani Company-1, including a 24-month warranty as to the "machine guns supplied under this contract."

## G.    MAFI's Contacts with U.S. Company-1 to Broker Defense Articles

### i.    MAFI Obtained an Offer Letter from a U.S. Defense Contractor to Sell AK-47 Rifles to Iraq

51.    Based on my review of CBP records, I have learned the following:

a.    On October 12, 2021, MAFI arrived in Miami, Florida, on a flight from Istanbul, Turkey. A CBP officer interviewed MAFI after she arrived for inspection at the Passport Control Section of Miami International Airport. During the interaction, a CBP officer conducted a manual search of two Apple iPhones that MAFI had in her possession ("Mafi's iPhones") and took photographs of some of the contents of those phones during the search.

b.    Among the contents the CBP officer photographed was an offer letter from a U.S.-based defense company ("U.S. Company-1") to a trading company based in Beverly Hills, California ("U.S. Company-2"), represented by MAFI and another individual (the "Offer Letter"). Pursuant to the Offer Letter, U.S. Company-1 offered to sell up to 40,000 new AK-47 rifles to

45

the Iraqi Ministry of Defense, via U.S. Company-2, for $350 per unit. The Offer Letter stated that "[t]his offer is subject to the International Traffic in Arms Regulations (ITAR) and restricted to those end users approved by the U.S. Department of State." The offer letter also stated that since U.S. Company-1 was "an exporter registered with the state department, we will be happy to take you and your client through the acquisition process," including assisting with the process for securing an export permit.[22]

52.  According to U.S. Company-1's Chief Executive Officer ("CEO"), U.S. Company-1 issued the Offer Letter following a meeting in which MAFI and her partner represented that U.S. Company-2 was seeking to buy AK-47s for use by the Iraqi Ministry of Defense. As set forth below, MAFI and U.S. Company-2 had not registered with DDTC as a broker or exporter of Defense Articles, and did not have a license or approval from DDTC to export or broker the export of weapons to Iraq.

53.  Based on my review of publicly available information, AK-47s are produced in fully automatic and semi-automatic configurations. The Offer Letter states that each AK-47 assault rifle would be provided with a grenade launcher. As set forth above, AECA and ITAR control the brokering of defense articles on the USML, which includes certain fully automatic weapons and grenade launchers.

---

[22] Based on my communications with a U.S. Department of Commerce, Bureau of Industry Security ("BIS") Special Agent, and my review of a report of an interview with U.S. Company-1's CEO, U.S. Company-1 was registered as a broker and exporter of Defense Articles with DDTC.

ii.     Evidence Corroborating the Offer Letter and
        MAFI's Relationship with U.S. Company-1

54.   Based on my review of BIS records and participation in an interview with U.S. Company-1's CEO, I know the following:

a.    During an interview on February 3, 2022, U.S. Company-1's CEO initially denied knowledge of any transactions with U.S. Company-2. U.S. Company-1's CEO said he had no information related to U.S. Company-2 or any individual associated with that entity.

b.    After I showed U.S. Company-1's CEO the image of the Offer Letter that was found on MAFI's phone, U.S. Company-1's CEO said his recollection was refreshed about the Offer Letter and the surrounding circumstances. U.S. Company-1's CEO said he met with MAFI and two other individuals in approximately mid-2018, after his former lawyer arranged the meeting.

c.    U.S. Company-1's CEO stated that at the mid-2018 meeting, one of the individuals accompanying MAFI held himself out to be a retired general in the Iraqi armed forces and the other individual said he was U.S. Company-2's President. MAFI and the others said they wanted to procure 40,000 AK-47 assault rifles for the Iraqi Ministry of Defense. U.S. Company-1's CEO stated that MAFI appeared to be "way over her head" in attempting to broker the transaction. After the meeting, U.S. Company-1 sent the Offer Letter to MAFI.

d.    After the meeting with MAFI, U.S. Company-1's CEO stated that he provided MAFI with guidance on how to comply with

47

the ITAR and how to register with DDTC. MAFI did not respond further in response to this guidance.

e.    U.S. Company-1's CEO stated that U.S. Company-2 never responded to the Offer Letter, and the transaction proposed in the Offer Letter was not completed.

55.  As set forth below, images captured from MAFI's iPhones on October 12, 2021, show documents reflecting MAFI's purported business relationship with U.S. Company-1. Specifically, based on my review of photographs taken by CBP personnel on October 12, 2021, I have learned the following:

a.    MAFI's iPhones had a purported "Independent Contractor and Exclusive Use Agreement," dated August 3, 2018, which stated, in substance, that U.S. Company-1 wanted to engage a representative to market "the Company's goods and services in Iraq under the rules and regulations allowed by the U.S. government," and that MAFI wanted to "open an office in Iraq under [U.S. Company-1's] name" to "market [U.S. Company-1's] products, establish customer contacts, and provide related services."

b.    MAFI's iPhones also contained a "Representation and Appoitment [sic] Letter" that further memorialized the purported relationship between MAFI and U.S. Company-1. The letter, signed by U.S. Company-1's CEO and dated June 18, 2018, designated MAFI as U.S. Company-1's representative in "Iraq and Kurdistan regions . . . responsible for Business Development and communication with customers, associates [sic] regarding our products and services." The letter also specifically noted that

48

"[a]ll activities are governed by U.S. ITAR export legal parameters."

  c. A business registration notarized in Eskishehir, Turkey, on May 16, 2019, indicated that MAFI was the director of a business named "[U.S. Company-1] International Construction, Food Industry, and Trade," based on my review of a summary translation prepared by an FBI Turkish-language linguist.

  d. Based on my training and experience, I believe the documents described above reflect MAFI purporting to establish businesses affiliated with U.S. Company-1 in Iraq and Turkey.

56. Based on my subsequent communications with U.S. Company-1's CEO and my review of FBI records, I have learned the following:

  a. On January 31, 2025, MAFI contacted U.S. Company-1's CEO via WhatsApp to request a meeting to discuss "a specialized matter". MAFI later sent U.S. Company-1's CEO a brochure purportedly from Turkish Company-2, which MAFI claimed was her company in Turkey.

  b. MAFI told U.S. Company-1's CEO that the products in the catalogue were available for sale if U.S. Company-1 had a buyer. MAFI also indicated she was looking to eventually manufacture the items in California and asked if U.S. Company-1 was willing to cooperate.

49

**H.   Evidence of MAFI's Knowledge of U.S. Sanctions on Iran**

57.   As set forth above, MAFI was aware of U.S. sanctions on Iran and the illicit nature of her arms brokering activities. For example, and as set forth in more detail above:

a.   After MAFI's meeting with U.S. Company-1's CEO in 2018, U.S. Company-1's CEO offered to provide MAFI with guidance on how to comply with the ITAR and how to register with DDTC. In the 2018 "Representation and Appoitment [sic] Letter" between MAFI and U.S. Company-1, which was found on one of MAFI's phones, the letter specifically noted that "[a]ll activities are governed by U.S. ITAR export legal parameters." See Section IV.G.

b.   In an interview on December 14, 2023, at LAX, MAFI described the financial channels that the Government of Iran used to evade U.S. sanctions. MAFI claimed to have information about the Iranian financial systems and money laundering channels used by the Government of Iran. See Section IV.B.i.

c.   On September 7, 2024, Co-Conspirator-1 sent MAFI a WhatsApp message with guidance regarding the payment for the AK-47 Ammunition contract, advising MAFI in relevant part that the Sudanese buyers should use "exchange solutions" to make payments, which was "important due to sanctions and other issues." See Section IV.F. In other discussions of payment for Iranian goods, described above, MAFI and her co-conspirators talk about payment in third party countries or through informal means, which I believe is evidence that they knew direct

50

payments could be seized or halted due to U.S. sanctions. <u>See</u> Sections IV.C, E.

58. At various times, MAFI instructed her co-conspirators or counterparties not to discuss the weapons deals by telephone and to delete messages referring to the weapons deals, and advised that payments "should be in small amounts" and "should be in cash," reflecting her knowledge that the deals were unlawful. <u>See</u> Section IV.F.

59. Based on my review of search warrant returns, one of MAFI's online accounts contained a photograph of a Memorandum of Understanding between Iran Tractors Manufacturing Co. ("ITMCO") and an Omani company. The memorandum, dated October 29, 2022, included the following acknowledgment:

> Since ITMCO is under heavy sanctions, as far as everyone reckons, monetary issues might face some unforeseeable problems; however, as discussed, ITMCO shall support the customer by trying any possible option.

I believe that MAFI's possession of this document reflects her familiarity with the impact of U.S. sanctions on Iranian commercial entities.

## I.   OFAC License History Check

60. On April 17, 2026, OFAC confirmed in response to a license history check request that a search disclosed no responsive records of applications submitted by or on behalf of, and no OFAC licenses issued to, any of the following names: Shamim MAFI, Co-Conspirator-1, Co-Conspirator-2, Atlas International Business LLC (aka Atlas Global Holdings, aka Atlas Tech LLC), and Omani Company-1.

**J.    DDTC License History Check and Determinations**

61.   On April 9, 2026, DDTC confirmed in response to a Registration and License History Checks Request that a search under the names Shamim MAFI (aka Raheleh Mafi) and U.S. Company-2 disclosed no responsive records of applications submitted by or on behalf of, and no DDTC export or brokering licenses issued to, any of these individuals or entities.

62.   On March 17, 2026, the DDTC's Office of Defense Trade Controls Policy determined that the Mohajer 6 (M6-H) UAV, the Shahed 136 UAV, and the AM-A-25 bomb fuze were defense articles subject to the ITAR. Specifically, DDTC determined as follows:

a.    During the period beginning January 1, 2023, through the present, the Shahed 136 UAV was and is a defense article subject to the ITAR. USML Category IV(a)(2) described "[r]ockets, SLVs, and missiles capable of delivering less than a 500-kg payload to a range of at least 300 km," which this article satisfied.

b.    During the period beginning January 1, 2023, through the present, the Mohajer 6 (M6-H) UAV was and is a defense article subject to the ITAR. USML Category VIII(a)(5) described "[u]nmanned aerial vehicles (UAVs) specially designed to incorporate a defense article," which this article satisfied.

c.    During the period beginning January 1, 2023, through the present, the AM-A-25 bomb fuze was and is a defense article subject to the ITAR. USML Category IV(h)(25) described "[f]uzes specially designed for articles enumerated in paragraph (a) of this category (e.g., proximity, contact, electronic,

52

dispenser proximity, airburst, variable time delay, or multi-option)," which this article satisfied.

### K.   MAFI's Use of the Subject Premises

63.   Based on my review of California Department of Motor Vehicles ("DMV") records, the address listed on MAFI's driver's license is ████████████████████ Woodland Hills, California ████. DMV records show the driver's license was issued on or about September 22, 2022, and expires on or about September 23, 2026. During my review of search warrant returns, I saw photographs of this driver's license, which lists the address for the SUBJECT PREMISES.

64.   In addition, according to records obtained from Google for a Gmail account believed to be used by MAFI, a Google Pay account associated with this account listed the address ██████ ████████████ in "Woodland hills." This address is identified as the "Postal Address" in subscriber records, with the "created on" date listed as December 24, 2025. The same postal address records listed MAFI's phone number ending in x4057.

65.   The SUBJECT PREMISES is a townhouse-style apartment unit (████████) located in a garden-style, high-density multifamily residential community named ████████, near ████████████████. The ██████████ complex is bordered by ██████████████ to the north, ████████████████████ to the west, ██████████████ to the south, and ████████████████ to the east. There are two vehicle entrances to the apartment complex containing the SUBJECT PREMISES. One is located near the intersection of ██████████████ and ██████████████████, on

53

the south side of ███████████. The other entrance is located near the intersection of ████████████ and ████████████ ████████ on the north side of ████████████.

66. Based on my review of physical surveillance reports conducted on the SUBJECT PREMISES, MAFI was seen entering and exiting the premises on several instances between April 19, 2023 and April 13, 2026.

67. On or about April 13, 2026, law enforcement officers learned that MAFI was going to travel from LAX to Salt Lake City, Utah, and return the same day. Upon MAFI's return from Salt Lake City, law enforcement officers conducting surveillance saw MAFI drive from LAX to the parking area for the apartment complex containing the SUBJECT PREMISES. Based on my training and experience, it is common for individuals to return to their homes after travel, even for same-day trips.

68. Based on my review of travel records and travel alerts, MAFI frequently travels to and from Los Angeles, and she only spends part of her time in the United States. For example, below is a record of her travel into and leaving the United States since 2021:[23]

| Date | Into/Leaving United States | Departure Location | Arrival Location |
|---|---|---|---|
| April 4, 2026 | Into U.S. | Istanbul | Los Angeles |
| January 22, 2026 | Leaving U.S. | Los Angeles | Doha |
| October 17, 2025 | Into U.S. | Istanbul | Los Angeles |
| December 2, 2024 | Leaving U.S. | Los Angeles | Dubai |
| November 10, 2024 | Into U.S. | Doha | New York |
| May 11, 2024 | Leaving U.S. | Los Angeles | Dubai |
| May 5, 2024 | Into U.S. | Istanbul | Los Angeles |

---

[23] This chart does not reflect MAFI's domestic travel, such as the trip to Salt Lake City on or about April 13, 2026, described herein.

54

| December 14, 2023 | Leaving U.S. | Los Angeles | Istanbul |
| November 25, 2023 | Into U.S. | Istanbul | Los Angeles |
| May 25, 2023 | Leaving U.S. | Los Angeles | Istanbul |
| April 13, 2023 | Into U.S. | Istanbul | Los Angeles |
| October 14, 2022 | Leaving U.S. | Los Angeles | Istanbul |
| August 29, 2022 | Into U.S. | Dubai | Los Angeles |
| March 2, 2022 | Leaving U.S. | Los Angeles | Doha |

69. Law enforcement officers have learned that MAFI is scheduled to travel from LAX on or about April 18, 2026, to Istanbul, Turkey.[24]

* * *

70. As set forth in Attachment B, law enforcement officers are seeking to seize evidence of violations of the Subject Offenses from January 1, 2018, to the date of the proposed warrant. Based on my training and experience, I know that international schemes involving multiple conspirators, like the scheme described above, require meaningful preparation and development of trust and relationships among co-conspirators. Moreover, due to the nature of the communications described above, which show a high degree of sophistication, and the nature of the scheme, which involved weapons and defense articles being exchanged for substantial sums of money, I believe MAFI is continuing to commit the Subject Offenses. Based on my training and experience, I also believe records through the present will be relevant to show other executions of the same scheme, steps taken to conceal past activities or avoid

---

[24] Law enforcement officers have learned that MAFI recently stated that she was planning to leave to visit her children abroad and would return to the United States in approximately three weeks.

55

detection by law enforcement, reactions to the success or failure of the scheme, and other steps taken in furtherance of the Subject Offenses. Evidence from just before or after the execution of the scheme may also show a conspirator's control over relevant online accounts and bank accounts that were used to complete the Subject Offenses.

## V.   TRAINING AND EXPERIENCE REGARDING THE SUBJECT OFFENSES

71.  Based on my training and experience investigating violations of the Subject Offenses, I know the following:

a.   It is common practice for individuals involved in brokering and sanctions violation schemes to possess and use multiple digital devices at the same time, like MAFI possessing two Apple iPhones when she arrived at Miami International Airport in October 2021. Individuals engaged in the Subject Offenses often use digital devices to perpetrate their crimes due to the relative anonymity gained by communicating and conducting financial transactions electronically or over the internet. They often employ digital devices for the purposes, among others, of: (1) planning their schemes; (2) communicating about promised, ongoing, completed, or attempted activity or travel; (3) payment or other consideration for participation in the scheme; (4) communicating about efforts to conceal the scheme; (5) reacting to the success or failure of the scheme; and (6) coordinating meetings and other communications with co-conspirators. Digital devices used for export and foreign agent schemes may be backed up to online services, and documents, communications, location data, and activity information from

56

digital devices is frequently backed up to online services. These backups then can be reflected on different digital devices found inside the SUBJECT PREMISES and on MAFI's person.

b.   Based on my training and experience, I know that individuals engaged in the Subject Offenses often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators to conduct their scheme. Oftentimes, they do so on their digital devices and online accounts. Conspirators often use their digital devices to communicate with co-conspirators by phone, data text, SMS text, email, and social media, including sending photos. These communications, photos, and their drafts may be saved to cloud services and on digital devices found inside the SUBJECT PREMISES and on MAFI's person.

c.   Based on my training and experience, I know that key evidence of the Subject Offenses may include messages commonly sent to a subject's personal email accounts. This evidence may include banking information; information about social media accounts used; information about encrypted messaging applications used; information about motive to commit the Subject Offenses, like debts, ideological beliefs, or reactions to foreign events; and information about a subject's domestic and international travel. In this case, those communications, screenshots of communications, draft communications, and attachments may be synched to online

services and found on devices inside the SUBJECT PREMISES and on MAFI's person.

d.     Based on my training and experience, I also know that individuals who own cellphones often sync, backup, or copy the communications and data on those cellphones to other electronic devices such as laptop computers, desktop computers, other cellphones, and other electronic storage devices. Those communications and data can be synced for a number of reasons, including to allow the user to continue the same conversation on multiple devices or to safely store/backup in case messages are inadvertently deleted on one device. The synced communications and data could include text messages, photos, call history, and other electronic information. In many instances, I have seen individuals engaged in criminal activity create, send, and receive screenshots of key email or text message communications. They may also write draft text messages or emails in the popular Apple Notes application.

e.     Accordingly, communications made and data recorded using one electronic device could be automatically or manually synced on another electronic device. These materials can also be easily moved between an individual's electronic devices and storage accounts, such as by email and file sharing and transfers between devices and accounts. Devices are often synced to each other using online services.

f.     Records related to the identities and roles of co-conspirators or aiders and abettors to the Subject Offenses, including calendars, address books, telephone or other contact

lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when firearms were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise.

72.  Many of the records described above can be kept digitally (like on a phone or drive) or in hardcopy form. Both types of records are often found in a home. Some records are especially likely to be found in a home, like the SUBJECT PREMISES, such as travel records, receipts, ledgers, prior digital devices (like a cellphone no longer in use but still containing communications from the relevant period). Some individuals who commit the Subject Offenses may keep immediate communications on their phone or digital devices, but historical information about their crimes in a ledger, folder, filing cabinet, or other hardcopy record that may be found in a home. Based on my training and experience, even those people involved in the Subject Offenses who might try to delete or destroy incriminating records might still keep relevant records in their home. These could be seemingly non-criminal records, like travel information and records of ideology or motivation, but those records may still be relevant to the Subject Offenses.

73.  Furthermore, as set forth above, I believe MAFI spends only part of the year in the United States. Indeed, in some recent years she has spent only a handful of months each year in

the Los Angeles area. However, I believe the SUBJECT PREMISES is still likely to contain evidence and instrumentalities of the Subject Offenses. Specifically, based on my training and experience, individuals who keep multiple homes often keep devices in each of those locations, which are synced together using online services. MAFI may also keep devices in the United States for use when she is here for convenience's sake or because they are involved in different parts of the scheme. Some individuals involved in criminal schemes also use different devices to communicate with different co-conspirators. Based on my training and experience, I know that records kept in a home may be different from those records found on a person. Individuals tend to keep longer-term storage in homes they only use occasionally, but that can include evidence of the Subject Offenses like ledgers, contact information, business cards, travel information, visa and other immigration applications, business filings, licensing documents, passports, books or how-to guides for compliance with sanctions and export laws, records of bank accounts and online accounts used, physical correspondence, and digital devices no longer in active use.

74. Finally, based on my training and experience, I believe MAFI may keep evidence and records at her home in Woodland Hills that she does not want to be discovered by the Government of Iran, such as records of her work for other governments and private parties. MAFI may also keep bulk proceeds in the SUBJECT PREMISES that she wants to protect from seizure or search by the Government of Iran. MAFI has been

60

interviewed by the FBI and CBP on several occasions when traveling through U.S. airports, so, based on my training and experience, she may believe devices and records of her criminal activity are safe from law enforcement scrutiny (here or abroad) if she does not travel with those devices and records.

## VI.   TRAINING AND EXPERIENCE REGARDING DIGITAL DEVICES

75.   Based on my experience, training, and familiarity with cellphones, I am aware of the following:

a.   Cellphones frequently have telephone directory features, as well as methods to learn the call number associated with each cellphone, such as caller-identification features. Cellphones also typically contain records of recent call activity, both incoming and outgoing calls, and lists of stored telephone numbers and other identifying information, such as names. Cellphone users often maintain lists, such as address books or contact information, that are stored on the cellphone or its SIM or memory card.

b.   Cellphones typically have voicemail or voice-mailbox features that allow callers to leave voice and/or alphanumeric messages if the cellphone user does not answer. Voicemail is typically stored on the computer network of the provider of the cellphone's telephone service, which network is external to the cellphone, but may also be stored on the cellphone itself.

c.   Cellphones typically have messaging capabilities, including text, data, chat, digital photographs and video, MMS (i.e., multimedia messaging service), and SMS (i.e., short

61

message service) messaging and email (collectively, "text messages"), that permit the cellphone's user to send and receive text messages, including messages with digital photographs and video attached. Text messages and any attachments are typically stored on the computer network of the provider of the cellphone's telephone service, which network is external to the cellphone, but may also be stored on the cellphone itself.

d.   Cellphones often have electronic calendar features that allow the cellphone user to schedule appointments and meetings. Cellphones users often use that feature to remind themselves of meetings and appointments with friends and confederates.

e.   In addition to voicemail and text-messaging features, cellphones typically offer capabilities such as sending and receiving email, and accessing and downloading information from the Internet.

f.   Cellphones may have applications installed, including social media and messaging applications that permit the user to communicate with contacts using these applications.

g.   Cellphones with camera functions permit the cellphone user to take photographs and videos, which are stored on the cellphone itself.

h.   Cellphones may record location data that records where the user has carried or used the cellphone.

i.   The information described above usually remains accessible in the cellphone's memory even if the cellphone has

62

lost all battery power and has not been used for an extended period of time.

76.    Based on my training and experience, I also know that, where electronic devices such as the Subject Device are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or years after the criminal activity occurred. This is typically true because:

a.    Electronic files can be stored on an electronic device for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

b.    Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools. When a file is "deleted" on an electronic device, the data contained in the file does not actually disappear, but instead may remain on the device, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the device. Similarly, files that have been viewed on the Internet are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages. Thus, the ability to retrieve data from an electronic device depends less on when the file was created or viewed than on a particular user's operating system, storage capacity, and computer habits.

c.    In the event that a user changes electronic devices, like a cellphone, the user will typically transfer

63

files from the old device to the new device, so as not to lose data.

77.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently

64

used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

78.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

65

b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

79.   The proposed search warrants request authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an

enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

      c.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MAFI's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of MAFI's face with her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

80.  Furthermore, based on my investigation, I believe MAFI's children, who are adults, live abroad. This is consistent with MAFI's claim that she is leaving the United States to visit her children. Based on my investigation, I do not believe anyone else lives at the SUBJECT PREMISES. Law enforcement officers expect to attempt to arrest MAFI when she is traveling out of LAX on April 18, 2026, on a flight scheduled for approximately 8:00 p.m. Officers will then attempt to search the SUBJECT PREMISES. Accordingly, I believe good cause exists for authority to search the SUBJECT PREMISES after 10:00 p.m., when I believe the SUBJECT PREMISES will likely be vacant.

### VII. <u>CONCLUSION</u>

81.  For all of the reasons described above, I submit that there is probable cause to believe that MAFI has committed a violation of 50 U.S.C. § 1705 (a), (c) (Conspiracy to Violate the International Emergency Economic Powers Act).

82.  Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits,

and instrumentalities of violations of the Subject Offenses will

be found in the SUBJECT PREMISES and on MAFI's person.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __18th__ day of
April, 2026.

THE HON. A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE

68