**F I L E D**
CLERK, U.S. DISTRICT COURT

5/1/2026

CENTRAL DISTRICT OF CALIFORNIA
BY: _____KM_____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2026 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> SHAMIM MAFI, <br> aka "Raheleh Mafi," <br><br> Defendant. | CR  2:26-cr-00266-MCS <br><br> I N D I C T M E N T <br><br> [50 U.S.C. § 1705(a), (c): Conspiracy to Violate the International Emergency Economic Powers Act; 50 U.S.C. § 1705(a), (c): Violations of the International Emergency Economic Powers Act; 18 U.S.C. §§ 2(a), (b): Aiding and Abetting; 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment, unless otherwise indicated:

I.   Background

A.   The Defendant and Atlas International

1.   Defendant SHAMIM MAFI, also known as "Raheleh Mafi" ("MAFI"), was an Iranian national and lawful permanent resident of

the United States who maintained a residence in Woodland Hills, California, within the Central District of California.  MAFI was a United States person within the meaning of the Iranian Transactions and Sanctions Regulations, 31 C.F.R. § 560.314.  MAFI traveled frequently to and from the United States, the Islamic Republic of Iran ("Iran"), the Republic of Türkiye ("Türkiye"), the Sultanate of Oman ("Oman"), the United Arab Emirates ("UAE"), and other countries.

2.   Atlas International Business LLC, also known as "Atlas Global Holding" and "Atlas Tech LLC" ("Atlas International"), was a limited liability company registered on or about November 28, 2022, in Oman.  MAFI and her Iranian business partner ("Co-Conspirator-1"), were each 50 percent shareholders of Atlas International.  Atlas International was an entity "owned or controlled" by a U.S. person within the meaning of 31 C.F.R. § 560.215.  MAFI also served as an Atlas International executive.  As described herein, MAFI used Atlas International to broker the sale of weapons, weapons components, munitions, and ammunition on behalf of Iran and the Government of Iran.

B.   The IRGC, MODAFL, and the Iranian Entities

3.   The Islamic Revolutionary Guard Corps ("IRGC") was an Iranian military and counterintelligence organization under the authority of the Supreme Leader of Iran and was composed of ground, naval, and air forces -- such as IRGC's Intelligence Organization; an internal militia, the Basij; and an external operations force, the IRGC-Qods Force ("IRGC-QF").  The IRGC played a key role in Iran's development of ballistic missiles and unmanned aerial vehicles ("UAVs"), and in Iran's support for international terrorism and foreign terrorist organizations.

4.   On or about October 25, 2007, the U.S. Department of State designated the IRGC as a proliferator of weapons of mass destruction ("WMDs"), under Executive Order 13382.  Also on or about October 25, 2007, the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") designated the IRGC as a Specially Designated National and Blocked Person ("SDN") for its role in supporting the proliferation of ballistic missiles capable of carrying WMDs and procuring equipment that could be used to support the Government of Iran's ballistic missile and nuclear weapons programs.

5.   On or about October 13, 2017, OFAC designated the IRGC as a Specially Designated Global Terrorist under Executive Order 13224, relating to global terrorism, for its role in supporting the terrorist activities of the IRGC-QF.  In its announcement, OFAC noted that the IRGC "has played a central role to Iran becoming the world's foremost state sponsor of terror."

6.   On or about April 15, 2019, the U.S. Department of State designated the IRGC as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act, Title 8, United States Code, Section 1189, for the IRGC's direct involvement in terrorist plotting, support for terrorism, and hostage-taking.  In announcing the designation, the U.S. Department of State noted that:

> The IRGC FTO designation highlights that Iran is an outlaw regime that uses terrorism as a key tool of statecraft and that the IRGC, part of Iran's official military, has engaged in terrorist activity or terrorism since its inception 40 years ago.  The IRGC has been directly involved in terrorist plotting; its support for terrorism is foundational and institutional, and it has killed U.S. citizens.

7.   Among its activities hostile to the United States and its allies, the IRGC actively targeted nationals of the United States and

3

its allies living around the world for kidnapping and/or execution, including to repress and silence dissidents critical of the Iranian regime.  Additionally, the IRGC was engaged in terrorist activity as it provided material support to other FTOs, including Hamas, Hizballah, and others.

8.    At all times relevant to this Indictment, the IRGC was a designated FTO and an SDN.

9.    Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL") was Iran's defense ministry and part of the country's executive branch.  MODAFL was responsible for defense research, development, and manufacturing, and supervised Iran's development and production of missiles, weapons, and military aerial equipment.  The U.S. Department of State designated MODAFL as a proliferator of weapons of mass destruction on October 25, 2007, pursuant to Executive Order 13382.  OFAC designated MODAFL on March 26, 2019, as an SDN pursuant to Executive Order 13224 for assisting, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF.  At all times relevant to this Indictment, MODAFL was an SDN.

10.   Defense Industries Organization ("DIO") was an Iranian entity controlled by MODAFL. On March 30, 2007, the U.S. Department of State designated DIO under Executive Order 13382 for engaging in activities that materially contributed to the development of Iran's nuclear and missile programs, and OFAC added DIO to the SDN List.  At all times relevant to this Indictment, DIO was an SDN.

11.   Aerospace Industries Organization ("AIO") was an Iranian entity over which MODAFL had ultimate authority.  OFAC added AIO to

the SDN List pursuant to Executive Order 13382 on June 29, 2005. At all times relevant to this Indictment, AIO was an SDN.

C.   The Sudanese Entities

12.   The Ministry of Defence of the Republic of Sudan (the "Sudanese MOD") was Sudan's defense ministry and formed part of the executive branch of the Government of Sudan.  The Sudanese MOD was responsible for the country's national defense and oversight of the Sudanese Armed Forces ("SAF").

13.   Defense Industries System ("DIS") was Sudan's largest defense enterprise and operated as a manufacturing and procurement arm affiliated with the SAF.  On June 1, 2023, OFAC designated DIS as an SDN pursuant to Executive Order 14098 for being responsible for, or complicit in, or having directly or indirectly engaged or attempted to engage in, actions or policies that threaten the peace, security, or stability of Sudan.  At all times relevant to this Indictment, DIS was an SDN.

II.   Relevant Statutory and Regulatory Background

14.   The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, et seq., conferred upon the President of the United States the authority to deal with unusual and extraordinary threats to the national security, foreign policy, or economy of the United States.  Pursuant to that authority, the President had the authority to declare a national emergency through Executive Orders that had the full force and effect of law.

15.   Under IEEPA, it was a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued pursuant to IEEPA.  50 U.S.C. § 1705(a), (c).

16. On March 15, 1995, pursuant to IEEPA, the President issued Executive Order 12957, which found that the actions and policies of the Government of Iran constituted an unusual and extraordinary threat and declared a national emergency under IEEPA to deal with that threat. In two subsequent Executive Orders in 1995 and 1997, the President imposed comprehensive sanctions on Iran and clarified the original declaration of a national emergency. See Exec. Order No. 13,059, 62 Fed. Reg. 44,531 (Aug. 21, 1997); Exec. Order No. 12,959, 60 Fed. Reg. 24,757 (May 9, 1995). Since 1997, the President has continued the national emergency with respect to Iran and the 1995 and 1997 Executive Orders. The most recent continuation of this national emergency was on or about March 7, 2025.

17. To respond to the national emergency with respect to Iran, OFAC issued the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560. Absent permission from OFAC in the form of a license, these regulations prohibited, among other things:

a. The exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a U.S. person, wherever located, of any goods, technology, or services to Iran or the Government of Iran, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country with knowledge or reason to know that such goods, technology, or services were intended specifically for supply, trans-shipment, or reexportation, directly or indirectly, to Iran or the Government of Iran (31 C.F.R. § 560.204);

b. Any transaction or dealing by a U.S. person, wherever located, in or related to (i) goods or services of Iranian origin or owned or controlled by the Government of Iran, or (ii) goods,

technology, or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the Government of Iran. The term "transaction or dealing" includes purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing (31 C.F.R. § 560.206);

c.    Knowing engagement, by an entity owned or controlled by a U.S. person and established or maintained outside the United States, in any transaction, directly or indirectly, with the Government of Iran or any person subject to the jurisdiction of the Government of Iran that would be prohibited if engaged in by a U.S. person or in the United States (31 C.F.R. § 560.215); and

d.    Any transaction by a U.S. person, or within the United States, that evaded or avoided, had the purpose of evading or avoiding, attempted to violate, or caused a violation of any of the prohibitions in the ITSR (31 C.F.R. § 560.203).

18.  The term "U.S. person" means "any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States."  31 C.F.R. § 560.314.

19.  On May 4, 2023, pursuant to IEEPA, the President issued Executive Order 14098, which found that the situation in Sudan, including the military's seizure of power in October 2021 and the outbreak of inter-service fighting in April 2023, constituted an unusual and extraordinary threat to the national security and foreign policy of the United States and declared a national emergency under IEEPA to deal with that threat.  See Exec. Order No. 14,098, 88 Fed. Reg. 29529 (May 5, 2023).

III. Overview of the Criminal Scheme

20. Since at least in or about February 2024, defendant MAFI, together with others, devised and executed a scheme to broker, finance, and facilitate the sale and supply of weapons, weapons components, munitions, and ammunition on behalf of Iran and the Government of Iran, including the IRGC, MODAFL, and other Iranian entities, to foreign customers, in violation of IEEPA and the ITSR.

21. Defendant MAFI used Atlas International, a U.S.-person-controlled foreign entity, as a front company selling the weapons, weapons components, munitions, and ammunition to foreign customers, including the Sudanese MOD, DIS, and Sudanese front companies. MAFI and her co-conspirators negotiated and executed contracts on Atlas International's behalf. These contracts included: a contract dated September 6, 2024, for a total value of €61,656,000, for the sale of Mohajer-6 armed unmanned aerial vehicles ("Mohajer-6 UAVs"), along with ground control stations, guided bombs, bomb release units, and training, from MODAFL to the Sudanese MOD; a contract for the sale of 55,000 AM-A-25 bomb fuses, sourced from DIO and the IRGC, from Atlas International to a Sudanese front company ("Sudanese Company-1"); and a contract dated September 5, 2024, for a total value of $100,800,000, for the sale of 240 million rounds of 7.62x39mm AK-47 ammunition from Iran to the Sudanese MOD.

22. Defendant MAFI and her co-conspirators were aware of U.S. sanctions on Iran. For example:

a. On December 14, 2023, during an interview with Federal Bureau of Investigation ("FBI") agents at Los Angeles International Airport ("LAX"), defendant MAFI said she had knowledge of financial channels that the Government of Iran used to evade U.S. sanctions and

8

claimed to have extensive information about the Iranian financial system and money laundering channels used by the Government of Iran.

b.   On September 7, 2024, Co-Conspirator-1 sent defendant MAFI a WhatsApp message regarding payment for the AK-47 ammunition contract, advising MAFI to use "exchange solutions" to make payments, which Co-Conspirator-1 stated was "important due to sanctions and other issues."  That same day, MAFI relayed the same payment guidance to a Sudanese weapons broker ("Sudanese Representative-1").

c.   On October 21, 2024, in response to another Sudanese representative's communication regarding payment, defendant MAFI replied, "I think you should go to the cash transfer process.  I know it will be very sensitive.  I[t] should be in small amounts. In turkey we can just accept in exchange. And it should be in cash."

d.   MAFI possessed a Memorandum of Understanding between Iran Tractors Manufacturing Co. ("ITMCO") and an Omani company, dated October 29, 2022, that included the following acknowledgment: "Since ITMCO is under heavy sanctions, as far as everyone reckons, monetary issues might face some unforeseeable problems."

e.   On April 18, 2026, during an interview with FBI agents at LAX, defendant MAFI admitted that she knew that her weapons brokering activities violated U.S. sanctions on Iran.

23.  At no time did defendant MAFI or Atlas International apply for, receive, or obtain authorization or a license from OFAC to: engage in any transaction or dealing in or related to goods or services of Iranian origin or owned or controlled by the Government of Iran; export, reexport, sell, supply, or broker goods, technology, or services from or through the United States, or by a U.S. person

9

wherever located, to Iran or the Government of Iran; or transact with any SDN, including the IRGC, MODAFL, DIO, AIO, and DIS.

//

//

//

COUNT ONE

[50 U.S.C. § 1705(a), (c);

31 C.F.R. §§ 560.203, 560.204, 560.206, and 560.215]

24.   The Grand Jury incorporates and realleges the allegations set forth in paragraphs 1 through 23 above, as if fully set forth herein.

25.   Beginning on a date unknown to the Grand Jury, but no later than in or about February 2024, and continuing at least until April 18, 2026, in Los Angeles County, within the Central District of California, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, defendant SHAMIM MAFI, also known as "Raheleh Mafi," a United States person who was arrested in the Central District of California, together with others known and unknown, knowingly and willfully conspired to violate IEEPA, namely:

a.   To knowingly and willfully export, reexport, sell, and supply, and cause to be exported, reexported, sold, and supplied, goods, technology, and services, directly and indirectly, from the United States to Iran and the Government of Iran, and by a United States person, wherever located, to Iran and the Government of Iran, without first having obtained authorization or the required license from OFAC, in violation of 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.204;

b.   To knowingly and willfully engage in any transaction and dealing by a United States person, wherever located, in and related to goods and services of Iranian origin, or owned and controlled by the Government of Iran, and for exportation, reexportation, sale, and supply, directly and indirectly, to Iran and

11

the Government of Iran, without first obtaining the required license or authorization from OFAC, in violation of 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.206;

c.   To knowingly and willfully cause an entity owned and controlled by a United States person and established and maintained outside the United States to engage in any transaction, directly and indirectly, with the Government of Iran and any person subject to the jurisdiction of the Government of Iran that would be prohibited if engaged in by a United States person or in the United States, without first having obtained authorization or the required license from OFAC, in violation of 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.215; and

d.   To knowingly and willfully enter into any transaction that evaded and avoided, had the purpose of evading and avoiding, and caused a violation of the prohibitions of the ITSR, in violation of 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.203.

I.   OBJECTS OF THE CONSPIRACY

26.   The objects of the conspiracy were:

a.   To broker, finance, and facilitate the sale of weapons, weapons components, munitions, and ammunition from and on behalf of Iran and the Government of Iran, including the IRGC and MODAFL, to the Sudanese MOD, DIS, and other foreign customers;

b.   To export, reexport, sell, and supply weapons, weapons components, munitions, and ammunition from and on behalf of Iran and the Government of Iran to the Sudanese MOD, DIS, and other foreign customers;

c.   To profit from these illegal activities; and

d.    To evade the prohibitions and licensing requirements of IEEPA and the ITSR.

II.  MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

27.  The objects of the conspiracy were to be accomplished in substance as follows:

a.    Defendant MAFI and her co-conspirators would incorporate and operate front companies, including Atlas International, to use for the sale of weapons, weapons components, munitions, and ammunition;

b.    Defendant MAFI and her co-conspirators would solicit orders from the Sudanese MOD, Sudanese front companies, and other foreign customers for weapons, weapons components, and munitions from, and owned and controlled by, Iran and the Government of Iran;

c.    Defendant MAFI would correspond with the MODAFL, the IRGC, DIO, and other Iranian entities to source the weapons, weapons components, munitions, and ammunition to be brokered;

d.    Defendant MAFI and her co-conspirators would negotiate and execute sales contracts with the Sudanese MOD, Sudanese front companies, and other foreign customers on behalf of Atlas International;

e.    Defendant MAFI and her co-conspirators would arrange for foreign delegations to travel to Iran to inspect goods, finalize contracts, and make advance payments to Atlas International and other front companies;

f.    Defendant MAFI and her co-conspirators would provide and cause others to provide services to Iran and the Government of Iran in connection with the sales of weapons, weapons components, and

13

munitions to the Sudanese MOD, Sudanese front companies, and other foreign customers;

g.    Defendant MAFI and her co-conspirators would use informal money transfer mechanisms, including currency exchanges and hawalas, to effectuate payment for the goods and evade U.S. sanctions on the Iranian financial sector; and

h.    Defendant MAFI and her co-conspirators would intentionally conceal the role of Iran and the Government of Iran in the transactions.

i.    Defendant MAFI would take steps to conceal her illegal weapons trafficking scheme from the United States.

III. OVERT ACTS

28.    In furtherance of the conspiracy and to accomplish its objects, defendant MAFI and her co-conspirators committed and caused to be committed the following overt acts, among others, in the Central District of California and elsewhere:

A.    Brokering the Sale of Iranian Mohajer-6 Armed UAVs to Sudan

Overt Act No. 1:    On or about July 24, 2024, defendant MAFI received a WhatsApp message from Sudanese Representative-1 containing the text of a draft contract for the purchase of Mohajer-6 UAV systems by the Sudanese MOD.

Overt Act No. 2:    On or about July 26, 2024, defendant MAFI sent a completed draft of the Mohajer-6 UAV contract to Sudanese Representative-1 via WhatsApp.

Overt Act No. 3:    On or about July 27, 2024, after receiving the text of the "final version" of the Mohajer-6 UAV contract from Sudanese Representative-1, defendant MAFI sent the draft contract via WhatsApp to an Atlas International executive ("Co-Conspirator-2") for

14

review.  The draft contract identified Atlas Tech LLC, represented by defendant MAFI, and the Sudanese MOD, represented by a Sudanese official ("Sudanese Representative-2"), as the parties to the agreement.

Overt Act No. 4:   On or about September 6, 2024, defendant MAFI received the signed Mohajer-6 UAV contract from Sudanese Representative-1, which provided that Atlas Global Holding would supply six Mohajer-6 UAVs, 30 UAV bomb release units, two ground control stations, 300 guided bombs, and other related equipment to the Sudanese MOD for €61,656,000.

Overt Act No. 5:   On or about November 12, 2024, while in the Central District of California, defendant MAFI communicated with Co-Conspirator-2 via WhatsApp regarding setting a seven-day deadline for the Sudanese delegation to travel to Iran to finalize the Mohajer-6 UAV contract.

Overt Act No. 6:   In a letter to Sudanese Representative-2 dated on or about November 16, 2024, Co-Conspirator-2, signing as Atlas International's Vice President, requested that the Sudanese MOD make an advance payment under the Mohajer-6 UAV contract in Türkiye or the UAE, and stated that the advance payment and payment receipt should be presented "as goodwill" before arranging "the final meeting with the Ministry of Defense" in Iran.

Overt Act No. 7:   On or about December 7, 2024, defendant MAFI signed a letter as Atlas International's Managing Director addressed to the Sudanese MOD regarding final payment decisions for the Mohajer-6 UAV contract.  In the letter, defendant MAFI requested that she and a Sudanese representative ("Sudanese Representative-3") "be approved for the final payment decisions" in light of the

"complexities of payment operations," and that Sudanese Representative-3 travel to Kish, Iran, for an in-person meeting "due to the time-consuming nature of the process."

Overt Act No. 8:   On or about January 4, 2025, defendant MAFI saved an end-user certificate she had received from Sudanese Representative-3 to one of defendant MAFI's online accounts.  The end-user certificate identified Atlas International as the exporter and the Sudanese MOD as the "End User" of seven Iranian Mohajer-6 UAV systems.

Overt Act No. 9:   On or about January 7, 2025, defendant MAFI arranged to meet in Tehran, Iran, with representatives of the Sudanese MOD, including Sudanese Representative-3, to discuss and finalize an amendment to the Mohajer-6 UAV Contract.  According to the proposed amendment to the contract, Atlas Global Holding, represented by defendant MAFI, would sell the Mohajer-6 UAVs to an Omani front company ("Omani Company-1") for the benefit of the Sudanese MOD, with payments to be made to an account provided by MODAFL in the UAE or Türkiye.

Overt Act No. 10:   On or about January 11, 2025, defendant MAFI told Sudanese Representative-3 via WhatsApp that she believed they could "start payment" under the Mohajer-6 UAV Contract.

Overt Act No. 11:   On or about January 12, 2025, defendant MAFI saved a letter from MODAFL's Deputy Directorate of International Affairs to the Sudanese Ambassador to Iran to one of defendant MAFI's online accounts.  In the letter, which was appended to the fully executed contract for the Mohajer-6 UAVs, MODAFL's Deputy Director of International Affairs wrote in Farsi that:

> In view of the negotiations held with Aerospace

16

Industries Organization management and the expressed desire to purchase Mohajer-6 drones, and the need to guarantee the payment for the sale of the drones, we hereby inform you that [the Mohajer-6 UAV contract] and its annex will be enforceable upon advance payment within 2 days from the date of sending the letter.

Overt Act No. 12:   On or about January 13, 2025, defendant MAFI sent Sudanese Representative-3 the contact information for a Turkish money exchange to receive a payment of approximately $2.7 million under the Mohajer-6 UAV contract.

Overt Act No. 13:   On or about January 15, 2025, defendant MAFI, as Atlas International's Managing Director, issued a payment receipt confirming that Atlas International had received $995,900 through a Turkish money exchange in connection with the Mohajer-6 UAV contract.

Overt Act No. 14:   On or about January 22, 2025, defendant MAFI sent Sudanese Representative-3 a letter via WhatsApp authorizing Omani Company-1 to deliver a cash payment of $3,631,381 to a currency exchange in the UAE.

Overt Act No. 15:   On or about January 23, 2025, defendant MAFI sent a letter to Omani Company-1 confirming Atlas International's receipt of a $2,000,000 payment under the Mohajer-6 UAV contract.

Overt Act No. 16:   On or about January 24, 2025, defendant MAFI received a letter via WhatsApp from Sudanese Representative-3 informing defendant MAFI that, in accordance with the requirements of the Mohajer-6 UAV contract, she was "required to make necessary arrangements" with MODAFL to support the training program for the Mohajer-6 UAVs, including arranging for Iranian visas and other requirements to enable the Sudanese team "to complete their mission." The letter attached a list of 12 Sudanese nationals selected to

17

travel to Iran for Mohajer-6 UAV training, signed and stamped by the SAF.

Overt Act No. 17:  On or about February 13, 2025, defendant MAFI received a letter from a representative of a UAE currency exchange providing a breakdown of payments received in the amount of €3,434,024 in connection with the Mohajer-6 UAV Contract.

Overt Act No. 18:  On or about February 26, 2025, defendant MAFI sent a copy of the Mohajer-6 UAV contract to Co-Conspirator-1 via WhatsApp, along with photographs and a video showing the opening of a large crate containing U.S. $100 bills.

Overt Act No. 19:  On or about April 2, 2025, defendant MAFI received a letter from Omani Company-1 informing Atlas International that Omani Company-1 was "preparing to release the balance 80% payment through bank transfer from Dubai . . . to your authorized agent" and requested that Atlas International provide the bank account number for a currency exchange in the UAE.  The letter also stated that Omani Company-1 would transfer €23,889,556 to UAE currency exchange, after deducting the advance payment of €6,167,713 and Omani Company-1's 2.5% commission.

Overt Act No. 20:  On or about April 18, 2025, defendant MAFI informed Co-Conspirator-2 that she had received $2,000,000 from Sudanese Representative-3 under the Mohajer-6 UAV contract and that she had a meeting to discuss "136," referring to Iranian-made Shahed-136 UAVs.

Overt Act No. 21:  On or about April 18, 2025, Co-Conspirator-2 advised defendant MAFI against disclosing the contract details to anyone, told defendant MAFI he would send UAV information, and asked defendant MAFI to delete the message after saving the information.

18

B.    Brokering the Sale of Aerial Bombs from MODAFL to Sudan

Overt Act No. 22:   On or about January 23, 2025, defendant MAFI saved an end-user certificate, dated January 21, 2025, and signed by Sudan's Minister of Defense on behalf of the Sudanese MOD, to one of defendant MAFI's online accounts.  The end-user certificate certified that MODAFL "has been contracted by [a Sudanese front company] to procure [500 OJAN-500 aircraft bombs] from The Government of the Islamic Republic of Iran" for "exclusive use in wars by Sudanese armed forces."

Overt Act No. 23:   On or about March 12, 2025, defendant MAFI sent Co-Conspirator-2 a copy of an offer letter, signed by MAFI as Atlas International's Managing Director and addressed to Sudanese Representative-2, offering to supply 500 OJAN-500 aerial bombs to the Sudanese MOD at a price of 5,500 euros per unit, with the first installment to be supplied from China and subsequent installments to be supplied from Iran beginning in mid-2025.

C.    Brokering the Sale of Bombs Fuses from the IRGC to Sudan

Overt Act No. 24:   On or about May 28, 2024, defendant MAFI received a photograph of an AM-A-25 bomb fuse from Sudanese Representative-2 via WhatsApp, and replied that 40,000 units were available at $57 per unit.

Overt Act No. 25:   On or about May 28, 2024, defendant MAFI received a letter from Sudanese Representative-2 via WhatsApp containing a request for quotation, issued by Sudanese Company-1 to Atlas International, for 30,000 units of "AM-A" bomb fuses.

Overt Act No. 26:   On or about May 29, 2024, defendant MAFI sent Sudanese Representative-2 photographs of technical specifications, bearing DIO's logo, for AM-A bomb fuses.

19

Overt Act No. 27:   On or about June 8, 2024, defendant MAFI sent Sudanese Representative-2 a letter from Atlas International stating that 55,000 units of AM-A-25 bomb fuses were available at $57 per unit, and requested an end-user certificate to begin the procurement process.

Overt Act No. 28:   On or about June 24, 2024, defendant MAFI sent Sudanese Representative-1 a letter from a Tehran-based company ("Iranian Company-1") to Atlas International, signed by Iranian Company-1's General Director, stating that 55,000 pieces of AM-A-25 bomb fuses were available at $57 per unit.

Overt Act No. 29:   On or about July 2, 2024, defendant MAFI sent Sudanese Company-1 a letter requesting a $300,000 deposit for the contract dated June 25, 2024, to sell bomb fuses to Sudan (the "Bomb Fuses Contract").

Overt Act No. 30:   On or about July 29, 2024, defendant MAFI received a photograph of a cash transfer receipt in the amount of 183,500 AED from an Egyptian national ("Sudanese Representative-4") who had been appointed to represent DIS in the negotiation and signing of the Bomb Fuses Contract.

Overt Act No. 31:   On or about August 2, 2024, defendant MAFI sent Co-Conspirator-2 a draft letter setting forth the "necessary protocols" for the Sudanese buyers' upcoming trip to Tehran, Iran, which stated that the first day's meeting would be "to check the fuses and complete the contract and make the advance payment."

Overt Act No. 32:   On or about August 5, 2024, defendant MAFI sent an entry visa to Sudanese Representative-2 and his associates to facilitate their travel to Iran for the signing of the Bomb Fuses Contract.

Overt Act No. 33:   On or about August 8, 2024, defendant MAFI instructed Sudanese Representative-3 not to discuss the Bomb Fuses Contract over the telephone.

Overt Act No. 34:   On or about August 12, 2024, defendant MAFI exchanged voice messages in Farsi with an Iranian facilitator ("Co-Conspirator-3"), in which Co-Conspirator-3 advised defendant MAFI that according to Iranian Company-1's General Director, only the IRGC, not MODAFL, possessed the AM-A-25 bomb fuses; that the fuses were stored in an IRGC warehouse; and that the IRGC did not permit women or unauthorized personnel to visit its facilities.

Overt Act No. 35:   On or about August 12, 2024, defendant MAFI sent Sudanese Representative-4 a message providing travel protocols for the Sudanese delegation's upcoming trip to Tehran, Iran, in which MAFI referenced the "sensitive condition in the region" and "the sensitivity of the topic of meetings in Tehran."

Overt Act No. 36:   On or about August 28, 2024, defendant MAFI sent a message to Co-Conspirator-1, asking him to attend the inspection of the AM-A-25 bomb fuses at the IRGC warehouse in MAFI's place because women were not permitted to enter the IRGC facility.

Overt Act No. 37:   On or about September 10, 2024, defendant MAFI submitted a letter in Farsi on Atlas International letterhead to the IRGC's Deputy Directorate of Readiness and Support, requesting authorization to purchase 55,000 AM-A-25 bomb fuses for export to Sudan, and requesting that the IRGC issue the instructions necessary to prepare a sales contract.

Overt Act No. 38:   On or about September 29, 2024, defendant MAFI saved a letter from DIO to MODAFL's Export Directorate to one of her online accounts.  In the letter, dated September 23, 2024, DIO

21

informed MODAFL's Export Directorate that, in response to Atlas International's request to purchase 55,000 AM-A-25 bomb fuses, the AM-A-25 bomb fuses would cost $385 per unit, and that a valid end-user certificate and 100% advance payment would be required.

D.    Brokering the Sale of AK-47 Rifles and Ammunition from Iran to Sudan

Overt Act No. 39:   On or about August 7, 2024, defendant MAFI received a draft contract from Sudanese Representative-1 for the supply of 70,000 AK-47 rifles, 10 million rounds of 7.62x39mm ammunition, 1,000 rocket-propelled grenade launchers, and 500,000 rockets, among other items, to the Sudanese MOD.  The draft contract listed the seller as Atlas International, represented by MAFI, and the buyer as the Ministry of Defense of Sudan, represented by Sudanese Representative-2.

Overt Act No. 40:   On or about August 9, 2024, defendant MAFI confirmed to Sudanese Representative-1 via WhatsApp that defendant MAFI could supply the military equipment and ammunition listed in the August 7, 2024 draft contract.

Overt Act No. 41:   On or about August 11, 2024, defendant MAFI received via WhatsApp from Sudanese Representative-1 an urgent request for 10 million rounds of AK-47 ammunition, with payment to be made through a currency exchange in the UAE, and replied that Sudanese Representative-1's team was clear to travel to Iran.

Overt Act No. 42:   On or about August 13, 2024, defendant MAFI received via WhatsApp from Sudanese Representative-2 an end-user certificate for 10 million rounds of 7.62x39mm ammunition, signed by the Secretary General of the Sudanese MOD.

Overt Act No. 43:   On or about August 24, 2024, defendant MAFI informed Sudanese Representative-1 via WhatsApp that 10 million rounds of ammunition were ready and that the sale would be arranged through a company in Türkiye associated with defendant MAFI.

Overt Act No. 44:   On or about August 24, 2024, defendant MAFI forwarded to Co-Conspirator-1 an "urgent request for Kalashnikov ammunition" from Sudanese Representative-1, in which Sudanese Representative-1 stated the Sudanese MOD was "in a position to proceed with a contract for the supply of *250 million rounds*" of AK-47 ammunition, with monthly deliveries of 30 million rounds.

Overt Act No. 45:   On or about August 24, 2024, Co-Conspirator-1 sent defendant MAFI a price quote via WhatsApp for AK-47 rifles ($920 per unit), AK-47 ammunition ($0.605 per round), PK machine guns ($3,600 per unit), and PK ammunition ($2.90 per round).

Overt Act No. 46:   On or about August 31, 2024, defendant MAFI issued two letters on behalf of Atlas International to MODAFL's Export Directorate, requesting price lists and delivery procedures for, among other things, 10 million rounds of 7.62x39mm ammunition, 200 PK machine guns, and 2 million rounds of PK ammunition for the country of Sudan.  Defendant MAFI attached the end-user certificate for 10 million rounds of 7.62x39mm ammunition she had received from Sudanese Representative-2 to one of the letters.

Overt Act No. 47:   On or about September 2, 2024, defendant MAFI sent photographs depicting crates of ammunition to Sudanese Representative-2.

Overt Act No. 48:   On or about September 4, 2024, defendant MAFI asked Co-Conspirator-1 to review a draft contract for the supply of 240 million rounds of ammunition to the Sudanese MOD.

23

Overt Act No. 49:  On or about September 5, 2024, defendant MAFI received the signature pages of the contract for the supply of 240 million rounds of 7.62x39mm AK-47 ammunition to the Sudanese MOD, to be delivered in monthly shipments of 20 million rounds, for a total value of $100,800,000 (the "AK-47 Ammunition Contract").  The contract was signed by Sudanese Representative-2 on behalf of the Sudanese MOD and by defendant MAFI on behalf of Atlas Global Holding.

Overt Act No. 50:  On or about September 7, 2024, Co-Conspirator-1 sent defendant MAFI a WhatsApp message containing payment guidance for the AK-47 Ammunition Contract, in which Co-Conspirator-1 advised that the parties use "exchange solutions," which was "important due to sanctions and other issues."

Overt Act No. 51:  On or about September 7, 2024, defendant MAFI sent a WhatsApp message to Sudanese Representative-1 relaying the payment guidance she had received from Co-Conspirator-1.

Overt Act No. 52:  On or about September 10, 2024, defendant MAFI received a letter from DIO providing a price list for, among other items, 10 million rounds of 7.62x39mm ammunition, 2 million rounds of AKAT ammunition, 200 PK machine guns, and 2 million rounds of PK ammunition, along with payment instructions for delivery in Tehran, Iran.

Overt Act No. 53:  On or about October 21, 2024, defendant MAFI sent a WhatsApp message regarding payments under the AK-47 Ammunition Contract to a member of the Sudanese delegation, in which defendant MAFI stated, "I think you should go to the cash transfer process.  I know it will be very sensitive.  I[t] should be in small amounts.  In turkey we can just accept in exchange. And it should be in cash."

E.   Additional Brokering Activities Involving UAVs

Overt Act No. 54:   On or about May 20, 2025, Co-Conspirator-2 sent defendant MAFI a proposal for the sale of Iranian 500 B4-H kamikaze UAVs.

Overt Act No. 55:   On October 24, 2025, defendant MAFI asked an Iranian weapons broker ("Co-Conspirator-4") to provide a price list for various types of UAVs, including six sets of Mohajer-6 UAVs.

Overt Act No. 56:   On October 25, 2025, Co-Conspirator-4 sent defendant MAFI pricing information for a UAV squadron and left a voice message for defendant MAFI providing further details about the requested UAVs.

COUNT TWO

[50 U.S.C. § 1705(a), (c); 31 C.F.R. §§ 560.203, 560.204, 560.206, 560.215; 18 U.S.C. §§ 2(a), (b)]

29.   The Grand Jury incorporates and realleges the allegations set forth in paragraphs 1 through 23, and 28, above, as if fully set forth herein.

30.   Beginning in or around July 2024 and continuing through at least in or around April 2025, in Los Angeles County, within the Central District of California, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, defendant SHAMIM MAFI, also known as "Raheleh Mafi," a United States person who was arrested in the Central District of California, and others known and unknown, aiding and abetting each other, knowingly and willfully engaged in transactions and dealings, and attempted to engage in transactions and dealings, by a United States person, wherever located, in and related to goods and services owned and controlled by the Government of Iran; caused an entity owned and controlled by a United States person and established and maintained outside the United States to engage in transactions, directly and indirectly, with the Government of Iran and persons subject to the jurisdiction of the Government of Iran, that would be prohibited if engaged in by a United States person or in the United States; and exported, reexported, sold, supplied, attempted to export, reexport, sell, and supply, and caused to be exported, reexported, sold, and supplied, goods and services, directly and indirectly, by a United States person, wherever located, to Iran and the Government of Iran, without first having obtained authorization or the required license from OFAC.

31.  Specifically, defendant MAFI, a United States person, knowingly and willfully purchased, sold, and supplied, and brokered, financed, and facilitated the purchase, sale, and supply of, and attempted to purchase, sell, supply, broker, finance, and facilitate the purchase, sale, and supply of six Mohajer-6 armed UAVs, 30 UAV bomb release units, two UAV ground control stations, 300 guided bombs, and related equipment and training, from Iran and the Government of Iran, including MODAFL and AIO, to the Sudanese MOD, without having obtained authorization or the required license from OFAC.

COUNT THREE

[50 U.S.C. § 1705(a), (c); 31 C.F.R. §§ 560.203, 560.204, 560.206, 560.215; 18 U.S.C. §§ 2(a), (b)]

32. The Grand Jury incorporates and realleges the allegations set forth in paragraphs 1 through 23, and 28, above, as if fully set forth herein.

33. Beginning in or around May 2024 and continuing through at least in or around September 2024, in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, defendant SHAMIM MAFI, also known as "Raheleh Mafi," a United States person who was arrested in the Central District of California, and others known and unknown, aiding and abetting each other, knowingly and willfully engaged in transactions and dealings, and attempted to engage in transactions and dealings, by a United States person, wherever located, in and related to goods and services owned and controlled by the Government of Iran; caused an entity owned and controlled by a United States person and established and maintained outside the United States to engage in transactions, directly and indirectly, with the Government of Iran and persons subject to the jurisdiction of the Government of Iran, that would be prohibited if engaged in by a United States person or in the United States; and exported, reexported, sold, supplied, attempted to export, reexport, sell, and supply, and caused to be exported, reexported, sold, and supplied, goods and services, directly and indirectly, by a United States person, wherever located, to Iran and the Government of Iran, without first having obtained authorization or the required license from OFAC.

34. Specifically, defendant MAFI, a United States person, knowingly and willfully purchased, sold, and supplied, and brokered, financed, and facilitated the purchase, sale, and supply of, and attempted to purchase, sell, supply, broker, finance, and facilitate the purchase, sale, and supply of 55,000 AM-A-25 bomb fuses from Iran and the Government of Iran, including the IRGC and DIO, to Sudanese front companies and DIS, without having obtained authorization or the required license from OFAC.

COUNT FOUR

[50 U.S.C. § 1705(a), (c); 31 C.F.R. §§ 560.203, 560.204, 560.206, 560.215; 18 U.S.C. §§ 2(a), (b)]

35.   The Grand Jury incorporates and realleges the allegations set forth in paragraphs 1 through 23, and 28, above, as if fully set forth herein.

36.   Beginning in or around August 2024 and continuing through at least in or around September 2025, in Los Angeles County, within the Central District of California, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, defendant SHAMIM MAFI, also known as "Raheleh Mafi," a United States person who was arrested in the Central District of California, and others known and unknown, aiding and abetting each other, knowingly and willfully engaged in transactions and dealings, and attempted to engage in transactions and dealings, by a United States person, wherever located, in and related to goods and services owned and controlled by the Government of Iran; caused an entity owned and controlled by a United States person and established and maintained outside the United States to engage in transactions, directly and indirectly, with the Government of Iran and persons subject to the jurisdiction of the Government of Iran, that would be prohibited if engaged in by a United States person or in the United States; and exported, reexported, sold, supplied, attempted to export, reexport, sell, and supply, and caused to be exported, reexported, sold, and supplied, goods and services, directly and indirectly, by a United States person, wherever located, to Iran and the Government of Iran, without first having obtained authorization or the required license from OFAC.

30

37.  Specifically, defendant MAFI, a United States person, knowingly and willfully purchased, sold, and supplied, and brokered, financed, and facilitated the purchase, sale, and supply of, and attempted to purchase, sell, supply, broker, finance, and facilitate the purchase, sale, and supply of 240 million rounds of 7.62x39mm AK-47 ammunition from Iran and the Government of Iran, including MODAFL and DIO, to the Sudanese MOD, without having obtained authorization or the required license from OFAC.

FORFEITURE ALLEGATION

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offenses set forth in any of Counts One through Four of this Indictment.

2.    The defendant, if so convicted, shall forfeit to the United States of America the following:

(a)  all right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses; and

(b)  to the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party;

//

//

32

(c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

                                        A TRUE BILL


                                        /S/
                                        Foreperson


TODD BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant United States
Attorney

IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division

KEDAR BHATIA
Assistant United States Attorney
Chief, Public Corruption and
Civil Rights Section

DAVID C. LACHMAN
Assistant United States Attorney
Major Frauds Section